[Civ. No. 12519. First Dist., Div. One. May 22, 1944.]

CITY OF OAKLAND, Plaintiff and Appellant, v. KEY SYSTEM (a Corporation), Defendant and Appellant.

428

W. Reginald Jones for Appellant.

Brobeck, Phleger & Harrison, and Donahue, Richards & Hamlin for Respondent.

WARD, J.—This is a proceeding in quo warranto, brought by the city of Oakland through its port commission, for the purpose of determining by what right or authority the defendants are exercising certain franchises and privileges upon an area of tidelands within the territorial limits of said municipality and particularly designated and described in the complaint. Joined as defendants with Key System were Railway Equipment and Realty Company, Oakland Terminal Railroad Company and two fictitious corporations, but as to these the action was dismissed.

Two causes of action were set forth in the complaint, the first dealing with certain rights and privileges granted by section 1 of an ordinance of the city, No. 3099, and the other being confined to such of those rights as purport to have been granted by section 2 thereof.

Judgment was rendered that plaintiff take nothing by its first cause of action; and, as to the second, that the franchise described therein was at no time authorized by law or by the charter of the city, and is null and void. Each party has appealed from the portion of the judgment adverse to it. (In this opinion the municipal corporation will be referred to as the "City," and the Key System by that designation or as the "Company.")

The cause was submitted upon the pleadings and a written stipulation of facts, those pertinent to the questions raised on the respective appeals being the following:

Section 1 of Ordinance 3099 granted to the company's predecessor, a railroad corporation, for a term of fifty years "the right, privilege and franchise . . . to construct and maintain . . . freight and passenger depots, engine houses, workshops, wharves, docks, slips, ferries, landing places and other terminal facilities and railroads" over a strip of land 1,000 feet in width in San Francisco Bay, extending approximately $2\frac{1}{2}$ miles from the shore to the pierhead line and "during said term to use, operate and conduct said freight and passenger depots, engine houses, workshops, wharves, docks, slips, ferries, landing places and other terminal facilities and railroads, and to collect tolls, wharfage, dockage and other

charges thereon.'' The franchise became effective July 5, 1910.

The granting clauses above quoted are in the precise words of section 31, subdivision 29 of the city charter as it then read (Stats. 1909, p. 1328) and the ordinance recites that the property over which the franchise was granted lay within the area as to which that section applied. At the time the franchise was granted the area affected lay within the limits of the city, but the city had no proprietary interest in the lands covered thereby. Title to the land was transferred to the city in 1911.

Section 2 further granted ''the right, privilege and franchise during said term of fifty (50) years to use in common with others, and to have maintained as a fairway for the free and uninterrupted passage to and from said wharves, docks, slips, ferries, landing places and other terminal facilities, and for the purposes of general navigation the waters of the bay of San Francisco lying outside of said strip of land described in Section 1'' and contiguous thereto, and comprised within 1,000 foot strips lying to the north and to the south of the lands described in section 1 from the bulkhead line to the pierhead line, with an agreement on the part of the grantee that the bulkhead line might be moved westerly from its then location.

By section 3 the parties fixed upon an agreed line of ordinary low tide as of 1852 serving to delimit the westerly line of the privately owned land of the grantee from the Southern Pacific Oakland Mole to the northern line of the city. Also section 4 provides that ''in consideration of'' the rights granted, the grantee should reconvey to the city such wharfing-out rights as it possessed under the so-called Carpentier grant, should dedicate across its privately owned land certain streets as described and should convey to the city all its interests in lands west of the agreed low tide line. Section 5 requires that exercise of the franchise be commenced within six months.

Section 6 requires the holder of the franchise to pay ''as rent'' for the privileges thereby granted $1,000 per year for the first 25 years and $2,000 per year for the last 25 years ''of said term'' and provides that if any installment of rent should be unpaid the city ''shall have the right to forfeit and annul the rights, privileges and franchises hereby granted.'' Section 7 imposed the condition that all fills and other permanent structures ''shall revert to and become the

absolute property of the City of Oakland upon the expiration of said term of fifty (50) years'' with an option granted to the city to purchase structures not subject to such reversion, and section 8 provided that the ordinance should be inoperative unless written acceptance be filed within 90 days ''and upon such filing of said written acceptance this ordinance and said written acceptance shall constitute and be a contract between the City of Oakland and said . . . [grantee] and its 'successors and assigns.''

It is agreed that the ordinance was duly accepted; that the conveyances and dedications thereby required were duly made, and that the company is the successor of the original grantee of the franchise.

All rental payments required by section 6 of the ordinance including those accruing after the commencement of the action, have been made and retained by the city, which has not returned or offered to return any thereof.

When the franchise was granted, the company's predecessor had in existence a trestle supporting its double track railroad which extended diagonally across the entire franchise strip from a point near the northerly line thereof at the agreed low tide line to the ferry terminal located in the southwesterly corner of the strip. The location of these facilities is shown in an exhibit attached to the stipulation. These facilities were used by the company's predecessor in the operation of its railroad lines from the date of the franchise until 1916.

In 1911 the city applied for and obtained from the War Department a permit to extend a solid fill into the waters of San Francisco Bay. This was done as part of a larger project for the general development of the western waterfront of the city, and at the city's request the company's predecessor constructed such fill on the franchise strip at a cost of $1,136,000. This fill was made during the period 1913-1916 and was located along the northerly line of the franchise strip, being protected by a rock bulkhead along that line. From the easterly line of the franchise strip to a transverse rock wall substantially the entire width of the franchise strip was partially filled by permitting the dredged material to attain a natural slope. This method of construction was adopted to reduce the expense of construction, and also to prepare that part of the franchise area for further reclamation.

At the same time the timber trestle beyond the new fill line was relocated, extending along the north line of the strip

and then curving to the south to meet the ferry terminal facilities which were reconstructed and enlarged. This work was completed in 1916 and the interurban train service was operated over these facilities for many years thereafter.

After the work last mentioned was performed, a portion of the original trestle easterly from the terminal remained in place and was used for storing cars until 1933. In 1917 a spur track had been built extending southerly across the franchise strip in the vicinity of the transverse wall, which remained in place for serving an industry located on property of the city south of the franchise strip until 1930, at which time a new means of access to that industry was provided through a permit granted by the city for the construction of additional trackage along the western waterfront.

In 1933 the greater part of the ferry terminal facilities was destroyed by fire. Immediately thereafter the State of California instituted proceedings in eminent domain and under order of court took possession of portions of the franchise strip which it desired for construction of the San Francisco-Oakland Bay Bridge. The terminal facilities were then rebuilt in the area not taken by the State at a cost of $252,000. Subsequently a part of the franchise strip was conveyed to the State for the construction of the San Francisco-Oakland Bay Bridge and the bridge railway facilities owned by the State in connection therewith, subject to certain reserved rights of the company. The city also conveyed its interest in this property under a contract with the State. In this contract the existence of the franchise was recognized.

The portion of the franchise area as to which the city seeks to declare a forfeiture by abandonment and nonuse is an irregularly shaped area, a portion if which actually overlaps the area conveyed to the State in 1937 by both the company and the city. A large portion of the remaining area involved in the first cause of action, was, subsequent to the commencement of this suit, taken by the federal government under eminent domain proceedings and an order of possession of the United States District Court, and is now occupied by the facilities erected by the army for the Oakland Port of Embarcation.

Pursuant to an agreement with the army as part of the federal government, this case is prosecuted by the city, which has instituted condemnation proceedings as to portions of the land covered by the franchise. Between the city and the com-

pany there is no dispute relative to an award in condemnation. The city seeks to clear an alleged cloud on the title. The company may be benefited only to the extent of a continuation of its present rights for the remaining period of the franchise.

From the stipulated facts the trial court concluded "That the use of the property described in Section 1 of Ordinance 3099 of the City of Oakland and set forth in Exhibit A to the Amended and Supplemental Complaint herein, which is the subject of the first cause of action alleged in said complaint, is a matter primarily within the jurisdiction of the Railroad Commission of the State of California." And (2) "That the purported franchise described in Section 2 of said ordinance which is the subject of the second cause of action alleged in said complaint was at no time authorized by law or by the charter of the City of Oakland, and that the same is and at all times since the purported grant thereof has been null and void."

Taking up first the city's appeal, it contends that the issue of the user or nonuser of the property described in section 1 of Ordinance 3099 of the city of Oakland is not one exclusively within the authority of the Railroad Commission— arguing in this behalf that the test is whether or not the commission has acted in the matter; that the Public Utilities Act affirmatively supports the jurisdiction of the court; that reason is against concluding that the courts have no jurisdiction; and that the right to use the designated portion of the franchise area has been lost by nonuse. It supports this contention by the following considerations; that nonuser is a recognized cause of forfeiture; that forfeiture may be partial only; that the franchise itself provides for its loss by nonuse; that the franchise to engage in the business of wharfinger was never exercised and that the forfeiture was self-executing and occurred before the Railroad Commission had any power in the matter.

The city concedes that as to any existing and continuing use the company is making of the area described in the complaint the franchise exists, but points out that the only use shown by the record is that dredging material or spoils have been deposited in the area which furnish subjacent support for the rock fill. However, it agreed that the company is entitled to have this condition continue until the expiration of its franchise in 1960.

434

■ As previously stated, based upon the findings of fact, the court as a conclusion of law found that the use of the property described in the first cause of action "is a matter primarily within the jurisdiction of the Railroad Commission." Ordinarily this statement is correct. However, the jurisdiction is not exclusively with the commission. Questions of public convenience and necessity, and matters directly relating thereto, in connection with the operation of public utility franchises, are the concern of the commission; legal disputes pertaining to a continuance or cancellation of a franchise at the end of its designated period are solely within the jurisdiction of the courts. The cancellation of a franchise during the term of its existence for a cause specified therein is primarily a legal question and must be decided by the courts, but if convenience of the public is involved and continued operation is necessary, such interest may be paramount to the rights of the parties to the franchise, in which case the jurisdiction of the Railroad Commission is dominant and controlling. A restriction or limitation in one case may not apply under the facts of another. It is sufficient to say that under constitutional provisions the courts of this State recognize the independent and controlling jurisdiction of the Railroad Commission over public transportation utilities (Const. Cal., art. XII, §§ 22, 23), subject to review by the Supreme Court. (Public Utilities Act, Stats. 1915, p. 115; Deering's Gen. Laws, 1937, Act 6386). The superior court has no power to interfere with an order or decision of the Railroad Commission. (*Truck Owners & Shippers, Inc.* v. *Superior Court*, 194 Cal. 146 [228 P. 19].)

■ The Railroad Commission may have general jurisdiction over a transportation company and may properly have assumed jurisdiction in determining certain questions previously, but if the commission does not in fact *act* on the particular question involved the courts are forced to prescribe a remedy. In addition, the question involved may be strictly a legal one, in which event the courts take jurisdiction (*Sale* v. *Railroad Commission*, 15 Cal.2d 612 [104 P.2d 38]; *Hanlon* v. *Eshleman*, 169 Cal. 200 [146 P. 656]), but the powers of the commission are unlimited if the matter is cognate and germane to the regulation of public utilities. (*City of San Mateo* v. *Railroad Commission*, 9 Cal.2d 1 [68 P.2d 713].)

Thus, in certain cases and as to certain problems relating to public utilities the jurisdiction of the commission is exclu-

sive. As to other matters the regular law courts have jurisdiction. In between these two well-defined fields there is a somewhat ill-defined field in which the law courts have jurisdiction unless the commission has elected to act as to the particular subject matter. If it has elected so to act the exercise of such jurisdiction ousts the law courts of any jurisdiction assumed by them. It is in this field that the first cause of action falls.

Key System, on the first cause of action, relies upon *People* v. *Northwestern Pac. R. Co.*, 20 Cal.App.2d 120 [66 P.2d 697], where at page 122 the court said: "The briefs of the parties have narrowed the issues on this appeal. It is conceded therein that the superior court has jurisdiction to cancel a franchise under certain circumstances and that while the railroad commission has jurisdiction to determine whether the service actually rendered under a franchise is adequate and, if not, to require adequate service, said commission has no jurisdiction to cancel a franchise under any circumstances. It is further conceded that the courts may take judicial notice of the decisions of the railroad commission." The court then referred to a decision by the Railroad Commission upon the precise question, saying (pp. 122, 123): "It affirmatively appeared from the allegations of said amended complaint that the defendants had been and were actually operating boats and rendering some service under said franchise despite other allegations of the amended complaint which were based upon the plaintiff's conclusion that the service rendered was a sham and pretense and in fact no service at all because of its claimed inadequacy. But since 1912, exclusive jurisdiction has been vested in the railroad commission to determine the adequacy of service actually being rendered under a franchise by any public utility within the purview of the Public Utility Act. (Const., art. XII, §§ 22, 23; Public Utilities Act, Deering's Gen. Laws, Act 6386.) We therefore conclude that when the amended complaint affirmatively showed that some service had been and was actually being rendered under the franchise, said amended complaint was insufficient to state a cause of action for the cancellation of said franchise upon the theory of 'non-user and abandonment' at least in the absence of further allegations showing a decision of the railroad commission determining that the service rendered was inadequate."

In the present case the complaint does not allege that any

service was rendered at the time of the institution of the proceeding. In the Northwestern Pacific case the Railroad Commission had acted; in the present case, so far as the record indicates, the commission had not acted upon the particular point in controversy.

In *Truck Owners & Shippers, Inc.* v. *Superior Court, supra,* the commission had assumed jurisdiction by granting to plaintiffs a certificate of public convenience but had not "acted" on the question involved in the case, namely, the right of defendants therein to transport freight. At pages 149, 150 the nature of the controversy is stated: "The cause pending in the respondent court is a suit in equity and that court has jurisdiction to hear and determine the same and to enforce its judgment therein unless it has been divested of such jurisdiction by some provision of the constitution or by the legislature acting in pursuance of some constitutional authority. It is not seriously contended by petitioners that the amendment to the constitution relating to the Railroad Commission and to public utilities (art. XII, secs. 22, 23) contains language sufficient in itself to divest the superior court of its equity jurisdiction to hear and determine a cause involving a complaint against a transportation company, but it is insisted that because of the broad powers lodged in the legislature under said section 23 and its exercise of such powers in the enactment of the Public Utilities Act (Stats. 1915, p. 115) and the said Auto Stage and Truck Transportation Act, the sole recourse of the plaintiff in the injunction suit was to file its complaint with the Railroad Commission and there have its rights determined." In that case it was insisted that the Railroad Commission had exclusive jurisdiction to determine the question. The court, distinguishing between jurisdiction generally assumed, and the determination of the question of fact involved said (pp. 155, 156, 157): "In answer to the query it should be borne in mind that we are not here dealing with a situation where the commission *has acted.* (Italics added.) It may also be noted that the commission undoubtedly has power to inquire into the methods and activities of the plaintiffs as well as the defendants in said action as to their transportation operations, either on its own motion or on the complaint of petitioners. Likewise it may be noted that the functions of the commission may be brought into play by an application by petitioners

for a certificate of public convenience and necessity. If such certificate be granted the injunction in the pending cause would cease, for by its own terms it is enforceable against the petitioners only 'until they shall have obtained from the Railroad Commission of the State of California a certificate declaring that public convenience and necessity require such operation.' Furthermore, if the commission should assume jurisdiction in an investigation as to the activities of the petitioner and the injunction plaintiff, or both, and should determine under subdivision (3) of section 1 of the Auto Stage and Truck Transportation Act that the petitioners were not operating 'between fixed termini and over a regular route' and, therefore, were not transportation companies as defined by that act, its findings would not be subject to review and it would then have the power under section 31 of the Public Utilities Act to make all necessary orders to enforce its decision in the matter. . . . We entertain no doubt that when the commission has assumed and exercised its jurisdiction the court would conform its orders and process agreeably to the action of the commission made within its jurisdiction. When the commission has acted it may be said, as was very aptly stated in *Yolo Water & Power Co.* v. *Superior Court, supra,* [43 Cal.App. 332 (185 P. 195)] : 'Powers conferred by the constitution upon the railroad commission to supervise and regulate public utilities and to bring suit to enforce its orders and compel public utilities to obey the law are not inconsistent with the power conferred upon superior courts to entertain injunction suits instituted by others than the commission against public utilities. To so hold will not create any conflict between the courts and the commission, because in all such suits the courts will be bound and guided and controlled in all respects in entertaining and deciding or dismissing them as much by section 23 of the constitution and the public utility act as by any other provisions of the law.' . . . The question of exclusive control of public utilities is primarily one of legislative policy subject, of course, to constitutional grant or limitation. Where the courts have been denied or have refused to take jurisdiction, it has been said that it was the legislative policy to relegate all such questions to the commission having jurisdiction to entertain the same.''

In *Miller* v. *Railroad Commission,* 9 Cal.2d 190, 195, 197

[70 P.2d 164, 112 A.L.R. 221], the court held: "By section 23 of article XII of the Constitution all public utilities are made subject to control and regulation by the Railroad Commission. This grant of power to the commission is reiterated in section 31 of the Public Utilities Act. (Stats. 1915, p. 115.) This jurisdiction, however, is not exclusive, and until the Railroad Commission *has acted* in reference to any public utility the superior court has jurisdiction in equity to enforce an obligation imposed by law upon such utility. But after the commission has assumed jurisdiction over a public utility for the purpose of administering the law applicable to the activities of the utility, the commission has exclusive jurisdiction over the regulation and control of said utility and may take any action necessary to the proper and complete exercise of this jurisdiction. In the exercise of this jurisdiction the commission may set aside any prior order or determination of the courts in matters coming under the exclusive jurisdiction of the commission. This decision of the Railroad Commission in matters affecting public utilities is final and conclusive except as the same is restricted by section 67 of the Public Utilities Act, which provides for a writ of review to this court in certain matters." (Italics added.) "We further hold that said judgment was valid and binding upon the parties to said action until the Railroad Commission assumed jurisdiction of said utility for the purpose of regulating its operations, and upon its assumption of jurisdiction over the activities of said utility, any order or judgment of the superior court in conflict with the orders of the commission is to that extent ineffective and of no binding effect upon the parties thereto."

In the present case, upon the facts presented the superior court could enter a valid and binding judgment if the Railroad Commission should not assume jurisdiction upon a related question germane to the operation of the utility company. Upon its assumption of jurisdiction over the activities of the utility it would be proper, in view of the heretofore cited cases based upon constitutional provisions, to cease further the determination of a question of fact. If the commission should "act," as by order or otherwise, in determining a question (and it may up to date be assumed that such determination will not be in disregard of established rules of law), such order is binding upon the courts.

This brings us to the question of the rights of the parties to invoke the offices of the Railroad Commission on the first cause of action. Irrespective of their rights to demand a hearing, if any legally exist, the commission could under its rules of practice "on its own motion" have initiated an investigation to determine whether the company would be able to meet the requirements of transportation, if any there be, at the present time or in the reasonably immediate future. These are factual matters in connection with which an appellate court should not interfere.

In brief, the matter primarily involved herein may be within the jurisdiction of the Railroad Commission, but is not exclusively so—hence a reversal of the order and decree made in the first alleged cause of action becomes necessary.

It has been suggested that in view of the stipulation of facts this court may pass upon the merits of the controversy. Eliminating the interest of the commission, if any, in the continuance of the strip or part thereof as a matter of necessity for public convenience, we find from the record, including the maps and diagrams submitted, that there is a part of the strip (approximately two hundred feet in width along the northerly edge of the franchise area) that may still properly be held by the company. This possibility is a fact admitted by the city. Appellant city does not contend that the entire franchise referred to in the first cause has been forfeited, but only that covering the unused area. Whether the extent of nonuse or disuse, if that should be the fact, was a breach of public duty by the franchise holders, seems to be a question of fact which should be determined by the commission. It is advisable that the trial court proceed in accordance with the views herein expressed.

Coming now to the company's appeal from that portion of the judgment holding to be void any rights purported to be granted by section 2 of Ordinance 3099 in the area referred to as the south fairway, the ground of the trial court's decision was that this grant violated the provisions of subdivision 29 of section 30 of the charter of the city, as it existed at the time of the passage of the ordinance, to the effect that "no franchise for terminal facilities upon land exceeding 1,000 feet of frontage on the waterfront shall be granted to any one company or corporation or to any companies or cor-

porations under one management and control," section 1 of the ordinance, it will be recalled, having already conferred a franchise for such facilities upon a full 1,000 feet of water frontage. It is the contention of the company that the grant of rights contained in said section 2 of the ordinance is not in any sense a franchise or in fact permission to enjoy in the public domain anything more than is of common right, i. e., right of access over navigable waters,—that the city merely contracted thereby not to impede such rights of access to the lands covered by section 1 thereof, and, in any event, that the rights granted are not "upon land." The company further urges that if the rights granted to the fairway be void, the judgment nevertheless should be reversed for the purpose of determining what considerations the city has received from the transaction in order that restoration be made.

Section 2 of the grant uses the word "franchise." This use of the word may not be determinative but is indicative of intent and the rights of the contracting parties. There is no doubt that the grantee was given the use of 3,000 feet under the original franchise—one thousand of which is the basis of the judgment on count two of the complaint. This 1,000 feet abuts the 1,000 feet referred to in count one. It may be assumed that the extra north and south fairways were incidental to the main franchise. It should be conceded that the grant covering the middle 1,000 feet was valid, and that the franchise to the north and south fairways was granted in order to facilitate the exploitation of such middle portion. That it was in contravention of the charter provisions previously quoted need not be discussed at length. On this point the company is content to argue that there is some doubt whether it was a franchise at all. The grant of the extra widths was valid if not in contravention of the legal capacity of the grantor to bestow. It was not a grant of right over city-owned lands as the fairway belonged to the State. It was contemplated to be a part of or an adjunct to the middle portion and as such was greater in width than the law allowed. (*City of Oakland* v. *Hogan*, 41 Cal.App.2d 333 [106 P.2d 987].)

The company next contends, assuming the right to be a franchise, that the proviso of subdivision 29 of section 31 of the charter (Stats. 1909, p. 1328) relates merely to terminal facilities, and that as to such facilities the prohibition refers to "land" and not to access over waters.

A franchise to an area definitely specified, though submerged, is upon land. The granting of the right of navigation over the submerged area subjects that area to a servitude. Necessarily a franchise covering a body of water is in the nature of a franchise to the area of land submerged by it.

The company finally urges that if the franchise for the fairway is void, restoration should be made of the considerations moving from it, including the cost of improvements made and rentals paid.

When the grant of a franchise is in excess of the powers of the grantor, there is no obligation on its part to restore any real or supposed benefits. "It is scarcely necessary to observe that no contract can be made by a corporation which is *prohibited* by its charter or by the statute law of the State. And it is a general and fundamental principle of law that *all* persons contracting with a municipal corporation must *at their peril inquire into the statutory power* of the corporation or of its officers to make the contract; and a contract beyond the scope of the corporate power granted or conferred by the legislature expressly, or by fair implication, is void, although it be under the seal of the corporation." (Dillon, Municipal Corporations, 5th ed., § 777, p. 1154.) "For the purpose of clearly defining the rights and duties of all the parties to a municipal contract, an *ultra vires* contract, as the term will be used herein, and according to its strict and true construction, is a contract which is not within the power of a municipal corporation to make under any circumstances or for any purpose." "Conceding that a contract is *ultra vires,* the question arises as to what is the effect thereof, and the answer is for the most part plain. If a contract is *ultra vires* it is wholly void and (1) no recovery can be had against the municipality thereon; (2) there can be no ratification, except by the legislature; (3) the municipality cannot be estopped to deny the validity of the contract; and (4) there can be no recovery on an implied contract, although it has been executed and the municipality has received the benefit of the contract." (McQuillan, Municipal Corporations, 2d ed., § 1274, pp. 1115, 1117-1118.)

A proceeding in quo warranto, being remedial in nature, should be determined so as to make the remedy effective, if possible (44 Am.Jur., § 4, pp. 90-91.) When invoked to remedy the abuse, misuse or nonuse of a franchise, the action appears to be similar to an equity proceeding by in-

junction. It may partake of the essentials of an action to quiet title or of declaratory relief. It is an extraordinary proceeding and may at times be used as a drastic cure of the misuse of a special privilege granted by a governmental agency. It has the aspect of an estate in property. In taking away any part of privileges granted for the benefit of the public, a court should be cautious in the use of its jurisdictional power.

In the present proceeding the trial court determined that jurisdiction was primarily with the Railroad Commission and refused to entertain jurisdiction. Herein it is determined that, assuming that jurisdiction was primarily with the commission, it is not exclusively so. There should be no conflict between the courts and the commission. Exclusive control is a question that might well be determined by legislative policy. (*Yolo Water & Power Co.* v. *Superior Court,* 43 Cal.App. 332 [185 P. 195].) In the absence of special legislative direction the courts may, in the interests of justice, direct that notice be served upon parties who may probably or possibly be interested in the outcome of the litigation under constitutional or legislative provisions.

Because of the probable or possible interest of the commission in this action, as disclosed by the conclusions of law, that body should be notified of the pendency of this proceeding. The trial court is directed to require plaintiff to notify the commission of such pendency. The form of the notification and the time limit are questions to be determined by the trial court in its discretion in view of the facts of the case.

That portion of the judgment disposing of the first cause of action is reversed, the trial court to proceed in accordance with the views herein expressed. If the Railroad Commission should take action the present proceeding should be held in abeyance until the matter is determined by that body. That portion of the judgment disposing of the second cause of action is affirmed.

Peters, P. J., and Knight, J., concurred.

A petition for a rehearing was denied June 21, 1944, and defendant and appellant's petition for a hearing by the Supreme Court was denied July 20, 1944.