[Civ. No. 12814. Third Dist. Apr. 20, 1972.]

DENNIS C. MARTIN, Plaintiff and Appellant, v.
CITY OF CORNING et al., Defendants and Respondents.

**COUNSEL**

Watt & Leverenz and Carl B. Leverenz for Plaintiff and Appellant.

C. A. Stromsness, City Attorney, for Defendants and Respondents.

**OPINION**

JANES, J.—Plaintiff taxpayer appeals, after trial by the court, from a judgment entered in favor of all defendants in his action against the City of Corning, the city clerk, and the members of the city council.

In 1968, after first procuring an engineering cost estimate, the council and the city's director of public works determined that curbs and gutters should be installed along First Street in Corning. Cost of the curbs and gutters was estimated at $5,050.50.

The director of public works or his representative then contacted all owners of property abutting First Street and secured from each a written agreement to pay, on a front footage basis, the individual owner's proportionate share of the actual cost of the curb and gutter work. Upon completion of the project, the individual owner's payment was to be made to the city in a lump sum or over a period of 12, 18 or 24 months.[1]

---

[1]The obtaining of the property owners' agreements in 1968 in connection with the proposed curb and gutter construction bore some similarity to the provisions of an ordinance enacted by defendant city in 1958. That ordinance created a "Curb and Gutter Revolving Fund" to which $5,000 was transferred at the outset from the city's general fund.

The ordinance provided for the construction of curbs and gutters upon petition by the property owners and order of the city council, and upon the further condition that the property owners agree to pay to the city—for credit to the revolving fund—their proportionate share of construction costs. The ordinance required "the costs of said improvement to be taken from the Curb and Gutter Revolving Fund."

After the owners had signed such agreements, the director of public works—on order of the city council—orally notified Frank Willis, a local contractor, that he was to install the curbs and gutters at $1.50 per lineal foot, the same figure Willis had used on prior jobs of the same nature for the city. The First Street curb and gutter work was not advertised for competitive bids, and no such bids were received. Willis was the only contractor whom defendant city contacted.

Willis installed the curbs and gutters on First Street sometime between the summer of 1968 and the spring of 1969.[2] Upon the council's approval of his bill for completed work, Willis was paid by the city (not by the property owners). There was no evidence as to how much he was actually paid.[3] He testified he had not received full payment by the time of the trial.[4]

The principal theory pursued by plaintiff in his complaint and at trial was that the curb and gutter work done by Willis was substandard. The complaint further alleged, however, that the work was "not let out to the lowest bidder"; and, after the competitive bidding issue had been briefed, the court denied plaintiff's request for a special conclusion "[t]hat money paid for curb and gutter work out of the revolving fund [fn. 1, *supra*] is subject to the provisions of Government Code [section] 37902."

Section 37902 is part of Government Code title 4 pertaining to the gov-

Each owner's payment was to be made after completion of the work, and was to be either in a lump sum or by installments, plus interest. The installment schedule in the ordinance was *not the same* as that which the witnesses testified was applicable to the curb and gutter project proposed by the city council in 1968.

Before trial, a purported copy of the ordinance was submitted to the trial court by plaintiff in opposition to defendants' demurrer which was overruled. The court was required to take judicial notice of the ordinance. (Evid. Code, § 452, subd. (b), & § 453.) The ordinance, however, was not mentioned at trial; nor was there any evidence that the revolving fund was used by defendant city to pay for the curbs and gutters here involved. The court's written "Announcement of Intended Decision," as well as its findings of fact, nevertheless determined that a part of such payment came from the revolving fund.

[2]Concurrently. defendant city was engaged in *resurfacing* First Street. During the same period, Willis also installed curbs and gutters on *Sixth* Street; that project is not in issue on this appeal.

[3]There was no evidence to support the court's findings that "The City paid $1,287.50 for curb and gutter work on First Avenue [*sic*] for work done to City property" and that "The revolving fund paid $3,410.00 for the work on First Avenue [*sic*]." The uncontradicted testimony of the city clerk was that $1,287.50 was the actual cost of curbs and gutters on *Sixth* Street—not, as found by the court, on First Street. (See fn. 2, *supra*.) The figure "$3,410.00" is not mentioned in the evidence. There was no showing that part of the money for the First Street curbs and gutters came from "[t]he City" and that another part came from "[t]he revolving fund."

[4]Defendants' appellate brief (which cannot be accorded evidentiary status) alleges that Willis "was paid all of the funds due him for the First Street work, excepting for $879.90 . . . ."

ernment of cities; and, at the times here relevant, the section provided: "When the expenditure required for a public project exceeds two thousand five hundred dollars ($2,500), it shall be contracted for and let to the lowest responsible bidder after notice."[5] ▇ Where such a statute is applicable to a public contract, noncompliance with the provisions of the statute renders the contract void. (*East Bay Garbage Co.* v. *Washington Township Sanitation Co.* (1959) 52 Cal.2d 708, 714 [344 P.2d 289]; *Miller* v. *McKinnon* (1942) 20 Cal.2d 83, 87-89 [124 P.2d 34, 140 A.L.R. 570]; *Arthur* v. *City of Petaluma* (1915) 27 Cal.App. 782, 786 [151 P. 183].)

Plaintiff's sole contentions on appeal are that the curb and gutter project on First Street was subject to section 37902, and that the city's noncompetitive contract with Willis was therefore void. On the record before us, the contentions are sound. ▇ However, we must reverse the judgment for another reason—plaintiff's failure to join Willis as a defendant—which we discuss preliminarily.

### WILLIS IS AN INDISPENSABLE PARTY TO THE ACTION

The complaint sought an injunction restraining "the expenditure and further expenditure of public funds" for the curbs and gutters installed by Willis.[6] The complaint also prayed that defendants "be ordered to reject said works and have said works brought up to specification or seek damages to compensate for the construction of curbs and gutters which meet specifications." At trial, however, plaintiff expressly narrowed the scope of the relief requested and asked only for a declaratory judgment that the city's contract with Willis was void.

▇ Willis, as a party to the contract, was an indispensable party to the action, since his interests would inevitably be affected by a judgment rendering the contract void or enjoining further payment to him thereunder. (*Holt* v. *College of Osteopathic Physicians & Surgeons* (1964) 61 Cal.2d 750, 760-761 [40 Cal.Rptr. 244, 394 P.2d 932]; *Holder* v. *Home Sav. & Loan Assn.* (1968) 267 Cal.App.2d 91, 107 [72 Cal.Rptr. 704]; *Irwin* v. *City of Manhattan Beach* (1964) 227 Cal.App.2d 634 [38 Cal.Rptr. 875]; *Miracle Adhesives* v. *Peninsula Tile Assn.* (1958) 157 Cal.App.2d 591 [321 P.2d 482]; Code Civ. Proc., § 389.[7]) Inexplicably, although plaintiff

---

[5]By an amendment effective November 10, 1969, the $2,500 ceiling in section 37902 was raised to $3,500.

[6]Apparently the complaint was filed after Willis's bill for the completed project had been at least partially paid by defendant city. (See fn. 4, *supra,* and accompanying text.)

[7]A recent act substantially amending section 389 of the Code of Civil Procedure will not be operative until July 1, 1972. (Stats. 1971, ch. 244, §§ 15, 66.)

called Willis as a witness, plaintiff did not name him as a defendant. ■ "The absence of an indispensable party deprives the court of jurisdiction over the subject matter. [Citations.]" (*Southern Cal. Title Clearing Co.* v. *Laws* (1969) 2 Cal.App.3d 586, 589 [83 Cal.Rptr. 8]; see also, 3 Witkin, Cal. Procedure (2d ed. 1971) Pleading, § 133, p. 1805.)

Insofar as the record shows, in the trial court no point was made of plaintiff's failure to join Willis. Defendants' appellate brief calls it to our attention. Plaintiff's closing brief ignores the point. ■ "This issue is fundamental, and is valid, even though first raised on appeal" (*Roman Catholic Archbishop* v. *Superior Court* (1971) 15 Cal.App.3d 405, 412 [93 Cal.Rptr. 338]; see, 3 Witkin, Cal. Procedure (2d ed. 1971) Pleading, § 133, p. 1806), and "even though the trial court has determined the merits adversely to plaintiff" (*Southern Cal. Title Clearing Co.* v. *Laws, supra,* 2 Cal. App.3d at p. 589; see *Holt* v. *College of Osteopathic Physicians & Surgeons, supra,* 61 Cal.2d 750). ■ As said in *Irwin* v. *City of Manhattan Beach, supra,* "Since the appeal is from a void judgment, we are without authority to affirm it, as the trial court was without authority to render it." (227 Cal.App.2d at p. 639.)

## On the Record Before Us, Government Code Section 37902 Was Applicable to the Curb and Gutter Project

Since Willis is an unjoined indispensable party, we can make no binding disposition of plaintiff's contentions that the curb and gutter work was subject to Government Code section 37902, and that the Willis contract was therefore void. For the benefit of the trial court upon remand, however, we assess those contentions in light of the present record.

At the outset, only brief mention need be made of defendants' suggestion that, because plaintiff seeks merely to void the contract, the appeal is moot. Although the court made no finding as to whether Willis had been fully paid, he testified that he had not, and, as we have pointed out, defendants concede such nonpayment. (See fn. 4, *supra.*) Moreover, the issues presented are of public importance and should be set at rest so that defendant city may arrange for similar work without doubts as to the applicability of the bidding statute. (See *Perry* v. *City of Los Angeles* (1909) 157 Cal. 146, 147 [106 P. 410]; 6 Witkin, Cal. Procedure (2d ed. 1971) Appeal, § § 469-470, pp. 4424-4428.)

The trial court's written "Announcement of Intended Decision" indicates that it found "no substantial violation" of section 37902 for two reasons—*first,* because of some question in the court's mind as to whether the

curb and gutter work was a "public project" within the meaning of that section; and *second,* because "[t]he evidence does not . . . clearly indicate that any work done by Willis exceeded the limit of $2,500.00 . . . provided in the Statute."

Government Code section 37901, however, defines "public project" as used in section 37902, and included in such definition is "Street . . . work except maintenance or repair." ■ As generally used in statutes pertaining to the construction of public improvements, the word "street" or "roadway" includes "curbs" and "gutters." (See, Sts. & Hy. Code, § 5871; *Barber Asphalt Paving Co.* v. *Jurgens* (1915) 170 Cal. 273, 280 [149 P. 560]; *City Street Improvement Co.* v. *Taylor* (1903) 138 Cal. 364, 366 [71 P. 446]; cf., *Kitzman* v. *Newman* (1964) 230 Cal.App.2d 715, 722 [41 Cal.Rptr. 182].) There is no reason to think that the Legislature intended a different result as to section 37902, especially since section 37901 also broadly defines "public project" as including "A project for the erection, [and] improvement . . . of public . . . works."

The second reason stated by the trial court is no more tenable. ■ Although there was no evidence as to how much Willis was actually paid, the undisputed evidence was that the cost estimate obtained by the city came to $5,050.50 for the curbs and gutters on First Street—an amount over twice as large as the $2,500 ceiling in section 37902. (See fn. 5, *supra.*) Such cost estimate was sufficient to bring the proposed curb and gutter work within the bidding statute. (*Miller* v. *McKinnon, supra,* 20 Cal.2d at p. 93.) Indeed, as a practical matter, cities must necessarily depend upon cost estimates in determining whether section 37902 applies to a given project. If the trial court's reasoning were correct, and if applicability of the bidding statute depended upon the sum actually paid to the contractor, it would be necessary to wait until the project was *finished* before it could be ascertained whether section 37902 should have been followed *before* construction commenced—a result plainly never intended by the Legislature.

Defendants argue that the curb and gutter work "was done by the contractor, for the landowners and on their petition and agreement to pay, with the City performing only a ministerial function in connection with that work, taking it out of the character of public work." Defendants cite an ordinance of the City of Corning—an ordinance which, without evidentiary support, they claim was followed in this case (see fn. 1, *supra*)—and their ensuing contention is here set forth: "*All* abutting landowners in any particular block must petition to have the work done, and they must agree that they will pay the cost of improvement . . . . Since the election of

having the work done is entirely with the landowner, and the City has no right to demand that the work be done . . . , it would appear that the City of Corning is acting in the nature of a lending agent only, and the improvement is essentially private in nature, hence not subject to the provisions of Section 37901 [*sic*] of the Government Code." (Original italics.)

Defendants' argument is without merit, whether it be assessed in the context of the payment procedures shown to have been followed in this case or in the context of the ordinance cited by defendants.

"The competitive bidding requirement is founded upon a salutary public policy declared by the legislature to protect the taxpayers from fraud, corruption, and carelessness on the part of public officials and the waste and dissipation of public funds." (*Miller* v. *McKinnon, supra,* 20 Cal.2d at p. 88.) ■ Section 37902 contains no language whatever to differentiate between cases where the election to have the work done is made by the city governing body and cases where such election is made by affected taxpayers. The source of the *decision* to construct a public project is irrelevant to the purpose of section 37902 to protect the public fisc by placing controls on the *placement* of construction contracts. (Cf. *Marangi Bros.* v. *Board of Commissioners, etc.* (1954) 33 N.J.Super. 294, 304 [110 A.2d 131, 136-137].)

Defendants' theory that the city was a mere "lending agent" is equally unconvincing. It is undisputed that Willis's contract was with *the city,* that *the city* paid Willis, and that the owners of abutting property were to pay their proportionate shares to *the city.* In the method of its financing, the curb and gutter project was fundamentally the same as the ordinary public improvement paid for with public funds and amortized by special assessment. The label of "lending agent" could just as readily be applied to the city's role in the ordinary assessment situation—but it is obvious that such label could not render the bidding statute inapplicable.

The record before us therefore presents an even stronger case for application of the bidding statute than was present in *East Bay Garbage Co.* v. *Washington Township Sanitation Co., supra,* 52 Cal.2d 708. In the *East Bay* case, former section 6515.5 of the Health and Safety Code required competitive bidding on contracts to be awarded by a sanitary district "[i]f the total cost of any work exceeds . . . $2,500 . . . ." The court held that the bidding statute was applicable where the district contracted with a . scavenger firm to remove garbage within the district, the cost of the garbage collection *to be paid directly to the scavenger by the inhabitants of the district utilizing such services.* (See also *McKim* v. *Village of South Orange* (1945) 133 N.J.L. 470 [44 A.2d 784]; *Marangi Bros.* v. *Board of Commis-*

*sioners, etc., supra,* 33 N.J.Super. 294 [110 A.2d 131]; *Yohe* v. *City of Lower Burrell* (1965) 418 Pa. 23 [208 A.2d 847].)

The judgment is reversed.

Richardson, P. J., and Regan, J., concurred.