[Civ. No. 49264. Second Dist., Div. Three. Sept. 26, 1977.]

SHEA-KAISER-LOCKHEED-HEALY,
Plaintiff, Cross-defendant and Respondent, v.
DEPARTMENT OF WATER AND POWER OF THE CITY OF
LOS ANGELES, Defendant, Cross-complainant and Appellant.

680

682

**COUNSEL**

Burt Pines, City Attorney, Edward C. Farrell, Chief Assistant City Attorney, and J. David Hanson, Deputy City Attorney, for Defendant, Cross-complainant and Appellant.

Monteleone & McCrory, David P. Yaffe and William N. Cohen for Plaintiff, Cross-defendant and Respondent.

## OPINION

**COBEY, J.**—Defendant and cross-complainant, Department of Water and Power of the City of Los Angeles (DWP), appeals from a judgment against it and in favor of plaintiff, Shea-Kaiser-Lockheed-Healy, a joint venture (SKLH), made and entered following trial to the court. The judgment is in the principal amount of $225,152 and contains unchallenged awards of prejudgment interest and costs. ■ The judgment also provides that DWP shall take nothing on its cross-complaint.[1]

The damage award is made up of $211,152 for aggregate demanded and delivered in excess of the requirements of the contract between the parties and $14,000 for the disproportionate amount of three-fourth inch aggregate demanded and delivered.

Since for reasons hereafter stated we propose to affirm these two damage awards, we will not consider the alternate damage award of $128,700.[2]

### BACKGROUND

This litigation arises from the fact that during a three and one-half year contract between the parties the market value of the aggregate sold under the contract by SKLH to DWP increased to such a degree that it substantially exceeded the contract price.

---

[1]DWP in its final brief on rehearing for the first time challenges this provision in the judgment. This challenge comes too late. (See *Phelps* v. *Mayers*, 126 Cal. 549, 551 [58 P. 1048].) In the trial court counsel for DWP twice conceded that the evidence did not preponderate in favor of its cross-complaint. Furthermore, DWP now seeks to change the factual basis for its cross-complaint from a claim that it received less in quantity than that for which it paid to a claim instead of inferior material. The factual basis for its cross-complaint cannot be changed on appeal. (See *Miller* v. *Bay Cities Water Co.*, 157 Cal. 256, 285-286 [107 P. 115].)

[2]This damage award rests upon findings of bad faith on the part of DWP in its excessive stockpiling of aggregate during the last six months of the contract for use following the expiration of the contract.

■ As already mentioned, the case is before us on rehearing. In our vacated opinion herein we previously held that the judgment had to be reversed because the damage awards violated competitive bidding requirements. We now believe that since such requirements apply only to the procedure by which the price of goods purchased by a public entity is set (see *Miller* v. *McKinnon,* 20 Cal.2d 83, 87-88 [124 P.2d 34, 140 A.L.R. 570]) and have no application *as such* to the determination of damages to be assessed against a public entity for breach of a purchase contract, they are irrelevant to the propriety of the damage awards before us. These awards were made for breach of contract; they were not made pursuant to contract. They do not represent a recovery of price by SKLH from DWP but instead a recovery of court-ordered damages from DWP. Accordingly they are not precluded by competitive bidding requirements. (Cf. *Byson* v. *City of Los Angeles,* 149 Cal.App.2d 469, 472-473 [308 P.2d 765]; *Lee C. Hess Co.* v. *City of Susanville,* 176 Cal.App.2d 594, 598 [1 Cal.Rptr. 586]; *Bilardi Constr., Inc.* v. *Spencer,* 6 Cal.App.3d 771, 778-779 [86 Cal.Rptr. 406].)

FACTS

On or about September 26, 1968, DWP formally invited bids for furnishing and delivering aggregate for concrete and other uses for its Castiac power project in accordance with its specification 709. SKLH was the lowest responsible bidder for this sales contract. On or about December 19, 1968, SKLH and DWP entered into a written contract under which SKLH agreed to furnish and deliver to DWP during an approximately three and one-half year period, ending on July 1, 1972, aggregate for the aforementioned purposes. The contract between the parties included detailed specifications and addenda. These specified that: (1) for the purpose of comparing bids to determine the lowest bidder, it would be assumed that specified quantities of five kinds of aggregate totalling 495,000 tons would be purchased by DWP under the contract; (2) DWP would purchase under the contract specified quantities of the same five kinds totalling 386,000 tons. Additionally the contract granted to DWP an option of purchasing "additional quantities of aggregate up to the Department's maximum requirements for operation and storage during the contractual period." Finally, the contract set the maximum rates of delivery at 1,700 tons per day and 6,800 per week.

By letter dated October 13, 1970, SKLH requested from DWP "a schedule of estimated aggregate requirements to completion." DWP replied by letter dated November 9, 1970, with an estimate of 400,000 tons (or 700,000 tons overall), but noted that contract 709 did not specify "the ultimate quantity of aggregate to be purchased by the Department." The following May SKLH requested a breakdown of the sizes of aggregate required as deliveries were not following the bid proportions in this respect. The next month SKLH informed DWP that it would not deliver aggregate beyond the 700,000 ton figure. After further exchange of correspondence between the parties SKLH notified DWP by letter dated July 27, 1971, that its attorneys had advised it that, under California Uniform Commercial Code section 2306, subdivision (1), and a comment thereto, the contract between the parties contained an implied maximum quantity of 604,000 tons which SKLH did not intend to exceed. At the time of this letter SKLH's deliveries had not reached 604,000 tons. DWP rejected this interpretation of the contract and SKLH then stated that it would continue delivery of aggregate under protest with an explicit reservation of all rights. About this time SKLH again called to DWP's attention that sand and three-fourth inch aggregate were being demanded and delivered in proportions greatly in excess of those bid.

About the beginning of January 1972 DWP directed SKLH to deliver aggregate at essentially the maximum contractual rates of delivery largely to a new stockpile area on the east side of Castiac Creek. SKLH replied that it would do so only under the aforementioned conditions of protest and reservation of rights and that it might cease delivery on two weeks notice. A few days later, SKLH asked DWP for estimates of the various sizes of aggregate that DWP would require to complete the contract. DWP furnished such estimates, but repeated that the contract did not specify "the ultimate quantity of aggregate to be purchased by the Department."[3] Toward the end of January 1972 SKLH advised DWP that it would continue "to deliver material as required by the Department until July 1, 1972," but that these deliveries would be made under protest and reservation of rights. By the end of the contract period on July 1, 1972, SKLH had delivered to DWP 795,957 tons of aggregate pursuant to DWP's demands therefor.

---

[3] These estimates were revised upward in May 1972.

DISCUSSION

1. *The $211,152 Damage Award*

The principal issue between the parties is whether the sales contract between them contains an implied maximum quantity of 604,000 tons as asserted by SKLH. The trial court so found and on this basis further found that DWP breached the contract by demanding and obtaining 191,957 tons in excess of this maximum to the damage of SKLH in the amount of $211,152. The trial court reached these conclusions by applying to the contract between the parties the median theory set out in official comment 3 to California Uniform Commercial Code section 2306, subdivision (1).[4]

It seems clear that the applicable provisions of the California Uniform Commercial Code govern the sales contract before us. (3) DWP, although a public entity, is subject to the code in the sales transaction under review. (See §§ 2103, subd. (1)(a), 1201, subds. (28), (29), (30); see also *Northern Helex Company* v. *United States* (1972) 455 F.2d 546, 553 [197 Ct.Cl. 118].) ■ The decisive questions, though, are whether section 2306, subdivision (1), applies to the contract between the parties and, if it does, whether the trial court was correct in using the median theory of comment 3 in applying the subdivision.[5]

---

[4] This comment reads: "If an estimate of output or requirements is included in the agreement, no quantity unreasonably disproportionate to it may be tendered or demanded. Any minimum or maximum set by the agreement shows a clear limit on the intended elasticity. In similar fashion, the agreed estimate is to be regarded as a center around which the parties intend the variation to occur."

We note that the comment refers to "the agreed estimate," while the subdivision uses instead the term "stated estimate." We have found no explanation for this difference in terminology.

Under the median theory the difference between a stated estimate of purchases in the sales contract and the minimum amount the buyer is obligated to purchase, likewise stated in the contract, 'is treated as the limit of elasticity in a requirements contract. In other words, the maximum quantity implied is obtained by adding that difference to the stated estimate. Here, under the trial court's application of the theory, the minimum obligated purchase is 386,000 tons, the stated (bidding) estimate is 495,000 tons, and the difference between these two figures is 109,000 tons. This means that the elasticity limit of this contract so construed is roughly a 20 percent deviation from the median.

All code references hereafter are to the California Uniform Commercial Code unless otherwise indicated.

[5] Estimates are treated differently under the subdivision than they were in pre-code days. (See Comment, *The Extent of the Obligations to Buy and Sell in Requirements Contracts* (1968) 3 U.S.F.L.Rev. 99, 111.)

The only prior case, of which we know, using both this subdivision and this comment

The subdivision in pertinent part reads: "A term which measures the quantity by . . . the requirements of the buyer means such actual . . . requirements as may occur in good faith, except that no quantity unreasonably disproportionate to any stated estimate . . . may be . . . demanded." Under section 1201, subdivision (42), " '[t]erm' means that portion of an agreement which relates to a particular matter."

The portion of the agreement at issue is found in addendum No. 1 to the special conditions of the detailed specifications, and in an unmodified portion of those conditions. The portion is entitled "Quantity" and first contains a statement that "[f]or the purpose of comparing bids to determine the lowest bidder, it will be assumed that the following respective quantities of aggregate will be purchased during the contractual period." There follows specific quantities for the five kinds of aggregate covered by the contract. These total 495,000 tons, although this total is not expressly stated. Then "[t]he Department, however, agrees to purchase aggregate during the contractual period in the following respective quantities:" Five specific quantities for the various kinds of aggregate are then listed. These total 386,000 tons, but again the total of this minimum obligated purchase is not expressly stated.

The quantity condition then goes on to conclude as follows: "In consideration of the agreed purchase and in addition thereto, the Department shall have the option ·of purchasing, from time to time during the contractual period, additional quantities of aggregate up to the Department's maximum requirements for operation and storage during the contractual period. Said option shall be exercised by the issuance and delivery to the Contractor of orders for any portion thereof by the Purchasing Agent or his duly authorized representatives."

It seems clear that the subdivision applies to this quantity condition of the contract between the parties. It is that portion of their agreement which measures the quantity called for by the agreement, namely, "the Department's maximum requirements for operation and storage during the contractual period" to the extent the same may be ordered by DWP under its option.

■ The trial court found that DWP breached the contract between the parties "by demanding that plaintiff furnish 795,957 tons of

is *Romine, Inc.* v. *Savannah Steel Company* (1968) 117 Ga.App. 353 [160 S.E.2d 659, 660-661].

aggregate, said amount being unreasonably disproportionate to the stated estimate of requirements contained in the contract." This finding is based in part upon a preceding finding that the bidding estimate of 495,000 tons is a "stated estimate" within the meaning of the subdivision.

DWP challenges this use of the bidding estimate. It must be conceded that this use is different from the stated purpose for which the estimate was placed in the contract. But it is, nevertheless, an estimate stated in the contract and one upon which the bidders' bond was computed. Furthermore, it is the basis for the statement in the notice of award of the contract issued by DWP that DWP's maximum requirements for operation and storage during the contractual period are estimated at $940,500. This monetary figure is obtained by multiplying the contract price of $1.90 a ton (without discount of 10 cents per ton for payment within 30 days) by the bidding estimate of 495,000 tons.

Obviously this bidding estimate, prepared and promulgated by DWP, should have been a substantially reliable indicator of the quantity of aggregate that DWP expected to purchase under the contract. In fact, it was not a figure plucked from the air, but one developed by DWP's representatives from estimates of the amount of concrete they thought DWP would need to build the structures required for the project. This was a matter peculiarly within the knowledge of DWP.[6]

■   This brings us to the question whether it was improper for the trial court to use the median theory of official comment 3 in determining an implied maximum quantity. Admittedly, even an official comment is not part of a statute, but as long as the comment is a reasonable application of the statute consistent with its purpose, it may be followed. (See Weistart, *Requirements and Output Contracts: Quantity Variations Under the U.C.C.,* 1973 Duke L.J. 599, 607-608; cf. *Arellano* v. *Moreno,* 33 Cal.App.3d 877, 884 [109 Cal.Rptr. 421].) In our view comment 3 meets this standard.

----

[6] This bidding estimate proved to be quite low. The reasons for its being so appear to have been the omission therefrom of certain structures such as the tailbay slab, certain changes in structural design such as in the tailbay walls and the provision of sheer walls for the power house, and later decisions by DWP to use substantial quantities of concrete for other purposes such as the backfill around the walls of the power house and the buried portions of the penstocks. For some reason DWP decided to put the contract for aggregate purchase out for bids long before its design of the project was completed (including even the choice of the concrete mixes) and the designs of the structures were actually completed as they were constructed. SKLH appears to have known generally that this was the situation.

It is true that its application in this case resulted in less elasticity than the circumstances underlying the making of the contract might otherwise indicate, but this result stems in substantial part from DWP's decision to place its minimum obligated purchase quantity at roughly 80 percent of its bidding estimate.[7] This was undoubtedly done to encourage bidding for the contract and thus DWP has been hoist by its own petard.

DWP contends that we should not give this effect to section 2306, subdivision (1), because such effect was avoided by the contract of the parties. All that it advances in support of this contention, though, is the previously mentioned expressly stated purpose of the bidding estimate. We do not believe that the application of section 2306, subdivision (1), to a contract may be avoided so indirectly and, in any event, the very subdivision relied on by DWP (§ 1102, subd. (3)) provides further that the obligation of reasonableness, among others, "may not be disclaimed by agreement."[8] The unreasonably disproportionate exception of section 2306, subdivision (1), is clearly but a specific application of the obligation of reasonableness running throughout the code. (See e.g., § 2311, subd. (1).)

DWP also advances the argument that neither party intended this result—the implied maximum quantity of 604,000 tons. This possibly could be so,[9] but even the gap-filler provisions of the code have substantive effects. In other words, the contract before us was made subject to this subdivision of the code and its requirements of good faith and reasonable elasticity were thereby added to the obligations of the parties under their contract. (See *Flagg* v. *Sloane,* 135 Cal.App. 334, 336 [26 P.2d 874]; *Bell* v. *Minor,* 88 Cal.App.2d 879, 881 [199 P.2d 718].) This result also accords with the policy of the aforementioned section 1102, subdivision (3), that the obligations of good faith and reasonableness, among others, may not be disclaimed by agreement of the parties.

[7]Eighty percent of 495,000 tons is 396,000 tons. We do not know why the minimum figure used was 386,000 tons.

[8]The subdivision further provides that "the parties may by agreement determine the standards by which the performance of such obligations is to be measured if such standards are not manifestly unreasonable." No such standards appear in the contract before us.

[9]Apparently at the time the contract was bid neither party anticipated the very substantial increase in the market value of aggregate during the life of the contract.

■ DWP's final contention in this area is that SKLH waived this breach by continuing to deliver on demand after the implied maximum of 604,000 tons had been reached. As previously noted, however, such delivery was expressly made under protest and with an explicit reservation of rights. It therefore did not prejudice any of the rights reserved by SKLH, including the right to sue DWP in damages for this breach. (§ 1207.)[10]

Having disposed of the issue of DWP's liability for this breach, we now turn to the propriety of the $211,152 damage award itself. Here DWP first asserts that its demand for a quantity unreasonably disproportionate to its bidding estimate constitutes only an excuse for nonperformance by SKLH and cannot be a basis for a damage award in favor of SKLH. DWP cites no authority for this novel proposition. We are unaware of any and we reject it.[11]

■ The question remains whether the record supports this damage award. In this connection, the trial court found that "[t]he fair market value of said 191,957 excess tons of aggregate at the time and place of its delivery to defendant was $2.90 per ton, but plaintiff was paid only $1.80 per ton for said excess tonnage by defendant." This difference between the fair market value as found by the trial court and the discounted contract price of $1.80 a ton amounts to $211,152.70.

■ (See fn. 12.), ■ In its intended decision in this case,[12] the trial court said that it arrived at its finding of fair market value of $2.90 per ton by considering not only the contract price of aggregate but also bid prices and sales by and to others adjusted for time and other circum-

[10]Section 1207 reads: "A party who with explicit reservation of rights performs or promises performance or assents to performance in a manner demanded or offered by the other party does not thereby prejudice the rights reserved. Such words as 'without prejudice,' 'under protest' or the like are sufficient."

[11]Official comment 4 to the section on seller remedies in general (§ 2703) reads: "It should also be noted that this Act requires its remedies to be liberally administered and provides that any right or obligation which it declares is enforceable by action unless a different effect is specifically prescribed (§ 1-106)." Section 1-106 appears in the California Code as section 1106.

[12]This document designated herein as "ruling on submitted matter" may be examined by us to clarify the findings of the trial court. (See *Union Sugar Co.* v. *Hollister Estate Co.,* 3 Cal.2d 740, 750-751 [47 P.2d 273]; *Frustuck* v. *City of Fairfax,* 212 Cal.App.2d 345, 366 [28 Cal.Rptr. 357].)

stances. DWP has challenged the accuracy of this finding,[13] but this difference between market value and contract price seems to us to be a proper measure of the detriment SKLH suffered by reason of this breach by DWP of the contract. (See Civ. Code, §§ 3300, 3353.)

2. *The $14,000 Award*

So far as liability is concerned, the $14,000 damage award rests upon essentially the same legal basis as the larger damage award just discussed. In the contract the stated (bidding) estimate for three-fourths inch aggregate is 116,500 tons. The total amount of such aggregate delivered under protest by SKLH to DWP was 225,177 tons. This delivery exceeded the 20 percent elasticity limit by 30,717 tons. Stated otherwise, DWP's demand for three-fourths inch aggregate was unreasonably disproportionate to its bidding estimate in this amount. As explained in the trial court's intended decision, the $14,000 damage award is based upon the additional plant operational costs incurred in producing this excess proportion of three-fourths inch aggregate.

DISPOSITION

The judgment is affirmed.

Ford, P. J., concurred.

**ALLPORT, J.**—I dissent.[1]

Defendant Department of Water and Power of the City of Los Angeles, a department of the City of Los Angeles, a municipal corporation (DWP), entered into a written contract (and addendum) (contract 709) with Shea-Kaiser-Lockheed-Healy, a joint venture composed of four corporations—J.F. Shea Company, Inc., Kaiser Industries Corporation, Lockheed Shipbuilding and Construction Company and S.A. Healy Company (SKLH)—on December 19, 1968, under which DWP agreed to purchase and SKLH agreed to sell certain described aggregate (sand, three-fourths inch, one and one-half inch, three inch,

[13]DWP calls attention to a restriction upon the sale of the aggregate involved to public entities generally. To give effect to this restriction in computing damages would permit DWP to take advantage of its own wrong. (See Civ. Code, § 3517.) We will not do this.

[1]This dissenting opinion consists of a substantial portion of the original opinion prepared by Loring, J. and filed by this court May 24, 1977.

natural material) "for concrete and other uses for the Castiac Power Project ordered by the Department during the period beginning with the date of award of contract and ending July 1, 1972" (contractual period) at a price of $1.90 per ton with a "0.10 per ton discount for payment within 30 days."[2]

During the summer of 1971 a dispute arose between DWP and SKLH over the quantity of aggregate which DWP could order under contract 709. Mr. Shank, representing SKLH, wrote DWP stating that he had talked to a lawyer and he was repudiating the contract insofar as quantities in excess of 604,000 tons might be ordered. Shank stated that quantities in excess of 604,000 tons would be delivered if extra compensation were paid. SKLH delivered 604,000 tons by August 1971. DWP replied that such repudiation was a breach of contract and that it would call for bids on a new contract. DWP did advertise for new bids. The parties held several conferences and before DWP could accept any new bids, SKLH wrote a letter to DWP in which it agreed to continue deliveries of aggregate in excess of 604,000 tons "under protest" without waiver of rights, if DWP would consider in good faith SKLH's claim for extra compensation because of extra costs. DWP replied by letter that it would consider claims for extra compensation when supporting data was submitted.

DWP fell behind in its work schedule and by December of 1971 it became apparent that it would not be able to complete the project by July 1, 1972. It decided to stockpile the amount of aggregate which it would require to complete the project after July 1, 1972. SKLH put in evidence an interdepartmental memo from the files of DWP which explained that the reason for this decision was because if DWP did not order aggregate under contract 709 during the contractual period prior to July 1, 1972, and purchased aggregate after July 1, 1972, under a new contract it would probably be required to pay a price substantially in excess of $1.90 per ton because the "current estimated prices for concrete aggregate are $4.50. Under existing contract 709, the price of aggregate is $1.90 per ton for a gross savings to the Department of $2.60 per ton. The existing aggregate contract 709 permits the Department to stockpile aggregate on the project site."

[2]Since DWP appears to have always taken advantage of the 0.10 per ton discount, I will hereafter treat the contract as a contract to supply aggregate at $1.80 per ton.

Thereafter, commencing in January 1972 DWP ordered under contract 709 and primarily stockpiled the maximum daily quantity of aggregate allowed under contract 709 which totaled approximately 190,000 tons. Of this quantity DWP allegedly ordered a disproportionately high percentage of three-fourths inch aggregate which the trial court found to be 30,647 tons of three-fourths inch aggregate more than authorized by the contract.

SKLH filed an action against DWP seeking damages for breach of contract. The first cause of action alleged that under the contract SKLH was required to deliver only 604,000 tons of aggregate, whereas DWP demanded and received 796,742 tons of aggregate which caused damage to SKLH in the sum of $267,911. In a second cause of action SKLH alleged that DWP ordered a disproportionate quantity of sand and three-quarter inch aggregate which caused additional damage in the sum of $149,292.

On the first and second causes of action the court found that DWP demanded that SKLH deliver 795,957 tons of aggregate, whereas the contract, as interpreted by the court, only required SKLH to deliver 604,000 tons of aggregate with the result that SKLH "produced and delivered under protest to [DWP] 191,957 tons of material over and above that required by the contract." The court found that said 191,957 tons of aggregate had a fair market value of $2.90 per ton, of which sum DWP paid only $1.80 per ton, causing damages to SKLH in the sum of $211,152. The court further found that DWP demanded "an unreasonably disproportionate quantity of ¾ inch nominal size aggregate in relation to the other sizes demanded," which caused damage to SKLH in the additional sum of $14,000. Judgment was rendered in favor of SKLH in the total sum of $225,152 with prejudgment interest at 7 percent from February 2, 1973.

Although DWP presents several claims of error, I regard one claim of error as dispositive of this appeal. DWP contends that a chartered city is not liable in quasi contract or implied contract for materials delivered, because such a city can purchase only under competitive bid contracts and therefore it can only be liable for goods delivered under the written "Time and Price" competitive bid contract at a price not to exceed the contract price.

## Discussion

DWP is a department of the City of Los Angeles, which is a chartered city. The charter has the effect of a law of the State of California. (*City etc. of S. F. v. Workmen's Comp. App. Bd.* (1968) 267 Cal.App.2d 771 [73 Cal.Rptr. 429]; *C. J. Kubach Co.* v. *McGuire* (1926) 199 Cal. 215 [248 P. 676].) It has the full force and effect of a legislative enactment (*Bruce* v. *Civil Service Board* (1935) 6 Cal.App.2d 633 [45 P.2d 419]; *Tilden* v. *Blood* (1936) 14 Cal.App.2d 407 [58 P.2d 381]), and is "the supreme law of the State with respect to the government of such chartered cities." (*Adams* v. *Wolff* (1948) 84 Cal.App.2d 435, 440 [190 P.2d 665].) The charter acts not as a grant of power but as an instrument of limitation and restriction on the exercise of power over municipal affairs. (*City of Marysville* v. *Boyd* (1960) 181 Cal.App.2d 755 [5 Cal.Rptr. 598]; *City of Santa Monica* v. *Grubb* (1966) 245 Cal.App.2d 718 [54 Cal.Rptr. 210].) Section 385 of the Charter of the City of Los Angeles requires that every contract by the city or department thereof involving an expenditure of more than $500 shall be in writing executed by designated persons.

Section 386 (b) of the charter provides that (subject to certain exceptions in subparagraph (a) which are not here applicable) "*The City of Los Angeles shall not be, and is not bound by any contract involving the expenditure of more than twenty thousand dollars ($20,000.00) unless the officer, board, or employee authorized to contract shall first have complied with the procedure for competitive bidding established by this section.*" (Italics added.)

Subdivision (d) of section 386 requires every bidder to submit a certified check "for an amount not less than ten per cent of the aggregate sum of the bid" or surety bond in like amount. Various other subparagraphs of section 386 establish detailed procedures for such competitive bidding.

The law is well established that failure to comply with charter provisions relating to the making of purchases renders such purchases void. Where the power is thus limited liability cannot arise by estoppel or ratification. (*Gamewell F. A. T. Co.* v. *Los Angeles* (1919) 45 Cal.App. 149 [187 P. 163]; *Reams* v. *Cooley* (1915) 171 Cal. 150 [152 P. 293]; *Fountain* v. *City of Sacramento* (1905) 1 Cal.App. 461 [82 P. 637]; *Nash* v. *City of Los Angeles* (1926) 78 Cal.App. 516 [248 P. 689].) The mode of entering into contracts as prescribed by the city's charter is the measure of the

*power* of the city to contract and a contract not made in conformity with the prescribed mode is void and unenforceable. (*T. Kelly & Sons, Inc.* v. *Los Angeles* (1935) 6 Cal.App.2d 539 [45 P.2d 223].) Bidders are charged with notice of the charter provisions. (*Palo and Dodini* v. *City of Oakland* (1947) 79 Cal.App.2d 739, 744 [180 P.2d 764].)

Contracts which are beyond the *power* of the municipality or which its officers have no authority to make òr which are not made in the manner required by its charter, are void and the city is not bound by such contracts (*City of Pasadena* v. *Estrin* (1931) 212 Cal. 231 [298 P. 14]; *Dynamic Ind. Co.* v. *City of Long Beach* (1958) 159 Cal.App.2d 294 [323 P.2d 768]), even on the theory of an implied undertaking to pay the reasonable value. (*Williams Bros. & Haas* v. *City & Co., S. F.* (1942) 53 Cal.App.2d 415 [128 P.2d 56]; *City of Oakland* v. *Key System* (1944) 64 Cal.App.2d 427 [149 P.2d 195].)

California Cònstitution, article XI, section 10, subdivision (a) (adopted in 1970), reads in part as follows: "A local government body may not grant extra compensation or extra allowance to a . . . contractor after service has been rendered or a contract has been entered into and performed in whole or in part, or pay a claim under an agreement made without authority of law." (See note 84 A.L.R. 954 and cases collected wherein it is stated: "By the weight of authority, where by statute, charter, or constitutional provision, the power of a municipality, or other political subdivision, to make a contract, is limited, particularly where it is limited to a certain mode or manner of contracting, and any other manner of entering into a contract or obligation is expressly or impliedly forbidden, no implied liability arises against a municipality for benefits received under a contract entered into in violation of these mandatory provisions, for no liability can result as a matter of implication where the express provisions of the statute or Constitution negative its existence." See also note 33 A.L.R.3d 1172, wherein it is stated: "In cases involving contracts between a municipality and a contractor or vendor which were invalid because they were let without compliance with bidding requirements of an applicable statute or charter, the courts have generally taken the view that the municipality ordinarily cannot be held liable on quasi contract, unjust enrichment, or the like.")

As already stated, in the case at bar the trial court, interpreting contract 709 in accordance with the provisions of California Uniform Commercial Code section 2306, subdivision (1), concluded that under

contract 709 DWP did not have the right to order more than 604,000 tons of aggregate at $1.80 a ton or more than 224,460 tons of ¾ inch aggregate; that DWP ordered a total of 191,957 tons of aggregate more than was authorized by contract 709, of which total there were 30,647 tons more of ¾ inch aggregate than was authorized by contract 709. In this respect the trial court was in error.

I see no escape from the conclusion that either (1) the excess aggregate was supplied under contract 709 at the contract price of $1.80 per ton which had been arrived at by competitive bidding in compliance with the city charter; or (2) the excess aggregate was not supplied under contract 709, in which event it was not supplied under a contract let by competitive bidding as required by city charter section 386. An award of money based upon the court's calculation of the reasonable value of the excess aggregate on the theory of a quasi or an implied contract or on the theory of damages for breach of contract is in direct contravention of section 386 of the Charter of the City of Los Angeles which provides that the city shall not be bound by any contract which is not executed in accordance with charter provisions for competitive bidding and also in direct contravention of California Constitution, article XI, section 10, which prohibits DWP from granting an extra allowance to a contractor after a contract has been entered into and performed in whole or in part.

There is one further and unavoidable consideration. If DWP did not have the right under contract 709 to demand delivery of aggregate in excess of 604,000 tons (as the trial court found), then DWP did not have the *power* to pay for what it demanded without contractual authority. If this were true, DWP would be required to sue to recover the $1.80 per ton which it paid for the 191,957 tons of aggregate which it did not have the right to purchase or the power to pay for, since such purchase and payment for excess tonnage would be an illegal expenditure of public money and an ultra vires act. Upon the failure of DWP to collect such contractually unauthorized payment, a taxpayer could institute such an action on behalf of DWP. (*Miller* v. *McKinnon* (1942) 20 Cal.2d 83 [124 P.2d 34, 140 A.L.R. 570]; *Martin* v. *City of Corning* (1972) 25 Cal.App.3d 165 [101 Cal.Rptr. 678].) Such a result would clearly not be in the interest of SKLH.

What I am concerned with is not a question of contract interpretation but a question of *power* to contract. Did the municipal officials have the

*power* to demand delivery of more aggregate than was authorized by contract 709? The law is clear that where a municipality is one of the contracting parties, the mode of contracting is the measure of the power to contract. (*Dynamic Ind. Co.* v. *City of Long Beach, supra,* 159 Cal.App.2d 294.) If plaintiff's cause of action is based on contract, express or implied, other than for the price specified in contract 709, then the contract is *void* under section 386, subdivision (b) of the city charter and consequently SKLH had *no rights* thereunder.

I would reverse the judgment as to the first and second causes of action of the complaint with instructions to enter judgment in favor of the Department of Water and Power of the City of Los Angeles.

A petition for a rehearing was denied October 27, 1977, rule 27(e), California Rules of Court. Appellant's petition for a hearing by the Supreme Court was denied December 15, 1977. Manuel, J., was of the opinion that the petition should be granted.