[No. 3720–II.   Division Two.   March 31, 1980.]

THE DEPARTMENT OF FISHERIES, *Appellant,* v. J–Z SALES CORPORATION, ET AL, *Respondents.*

*Slade Gorton, Attorney General,* and *Rochelle E. Wienker, Assistant,* for appellant.

*Bruce T. Rinker* and *Edward B. O'Connor,* for respondents.

PEARSON, J.—Washington's Department of Fisheries appeals from a summary judgment in favor of J–Z Sales, Inc., granted by the Thurston County Superior Court in a breach of contract action brought by the Department against J–Z Sales.

At issue is whether a check tendered by J–Z Sales "as payment in full" for surplus fish and fish eggs was accepted by the Department in such a manner as to establish an accord and satisfaction of the amount due the State for the fish products under the parties' contract. The pivotal issue is whether the amount of the contractual obligation was unliquidated or in dispute at the time payment was ten-

dered. We affirm the judgment for the reasons set forth below.

The parties entered into a contract in 1974 whereby J–Z Sales agreed to buy surplus salmon carcasses and eggs from the Department. The Department had advertised for bids on the products and had estimated that the products available in the districts where J–Z Sales was the successful bidder would amount to 1,355,000 pounds of both edible and inedible fish and 39,000 pounds of eggs. The invitation to bid cautioned that

[t]he estimated pounds of fish in each district and category have been inserted in the bid form for the purpose of bidding on a per pound basis and are not to be regarded as being the actual pounds of fish to be taken under the contract.

The bid specifications went on to state that the "[s]uccessful bidder (or bidders) must take all fish or eggs offered in any category or district."

A problem arose, however. By letter of November 27, 1974, Mr. Kjell Dahl of J–Z Sales informed the Department that the amount of fish and eggs it was receiving under the contract had far exceeded the estimates provided on the bid sheet and that the market was flooded with cheaper fish caught by Indians. J–Z Sales suggested that the Department consider reducing the contract price to $.50/lb. for salmon eggs and $.10/lb. for fish, in contrast to the contractual prices of $1.75/lb. and $.21/lb., respectively. Thor Tollefson, then Director of the Department of Fisheries, replied by letter of December 5, 1974. He acknowledged the poor market conditions and the fact that J–Z Sales would receive at least twice the quantity of fish estimated for bid purposes. The letter then stated:

Your request for reduction in prices from $.21/pound to $.10/pound, and from $1.75/pound to $.50/pound for salmon eggs will have to await my review of the statutes, the contract, and legal precedents with the State Auditor's Office and the Attorney General's Office. We assume you are referring to a price reduction for some reasonable

portion of the surplus above the "Invitation to Bid Estimated Weight."

After all surplus fish and eggs had been accepted, J–Z Sales had received 843,630 pounds of fish above the bid sheet estimate and 94,480 1/2 pounds of eggs above the estimate. Pursuant to the contract prices, J–Z Sales then owed $418,493.10 to the Department, excluding any interest or penalties.

By letter dated June 10, 1975, Craig Hayes of Bellingham, attorney for J–Z Sales, transmitted to the Department a check for $205,036.06 as "payment in full" of its contractual obligation. The letter explained that the unexpected surplus of fish and eggs had combined with the poor market to cause economic hardship to the buyer. J–Z Sales, the letter claimed, had agreed to continue to buy the excess "upon being told by Fisheries Department representatives that adjustments would be made to the original purchase contract." The letter quoted RCW 62A.2–306(1)[1] and contended that J–Z Sales was not, under that statute, obligated to accept the excess products. The amount of the check was calculated as representing payment for the poundage in excess of the Department's bid estimates, multiplied by J–Z Sales' earlier suggested revised prices of $.10/pound for salmon and $.50/pound for eggs.

The Department replied on June 18, 1975, through an assistant attorney general. He stated that the check would be accepted as partial payment and deposited on June 30, and that he assumed J–Z Sales intended to arrange payment of the balance of the contract amount. Counsel for J–Z Sales replied on June 20 that the check was intended as payment in full and no arrangements were being made for further payments. The assistant attorney general on July

---

[1]RCW 62A.2–306(1) provides:

"A term which measures the quantity by the output of the seller or the requirements of the buyer means such actual output or requirements as may occur in good faith, except that no quantity unreasonably disproportionate to any stated estimate or in the absence of a stated estimate to any normal or otherwise comparable prior output or requirements may be tendered or demanded."

24, 1975, returned the check. The cover letter stated that the check would not be accepted as full payment and that legal action was contemplated in view of J–Z Sales' refusal to pay the full amount.

Mr. Hayes on behalf of J–Z Sales refused to take the check back. On July 29, 1975, he returned it to the Department, writing as follows:

> Due to your retention of the remittance for such a long period of time, we must decline your return of the check. So far as we are concerned your lengthy retention constituted an acceptance of the terms and conditions of our proposed settlement. There can be no claim of confusion on the State's part since we made our position clear. The retention of the draft was for an unreasonable time, as a matter of law, and the State accepted it in full accord and satisfaction. This is true regardless of whether the check was negotiated or not.

With the lines thus drawn, the Department sued for breach of contract in August 1975. In an affidavit dated August 28, 1975, another assistant attorney general stated:

> In order to assist the Court in a determination of all claims of the parties, in order to prevent the loss and destruction of said check in further transmittals between Olympia and Bellingham, Washington, and in order to preclude any claim or argument by the defendants concerning the status of said non–negotiated check, the plaintiff State of Washington Department of Fisheries hereby tenders said check to the custody of the Clerk of the Court of the Superior Court for Thurston County, Washington, pending resolution of the parties' contentions.

The check was endorsed as follows: "Pay to the order of the Superior Court Clerk of Thurston County. Donald Moos, Director of Fisheries." The funds have remained in the control of the clerk since then.

■ Defendants' motion for summary judgment was based upon the contention that an accord and satisfaction of the debt had been established by the conduct of the parties. The trial court granted the motion and the Department's appeal followed. The familiar rule is that the trial

court can grant a motion for summary judgment when, construing the evidence in the record in favor of the non-moving party, no genuine issue of fact exists and the moving party is entitled to judgment as a matter of law. *E.g., Adamski v. Tacoma Gen. Hosp.,* 20 Wn. App. 98, 103, 579 P.2d 970 (1978).

■ An accord is a contract between debtor and creditor to settle a claim by some performance other than that which is due. Satisfaction occurs when the accord is performed. *Plywood Marketing Assocs. v. Astoria Plywood Corp.,* 16 Wn. App. 566, 574, 558 P.2d 283 (1976). Any claim, whether disputed, unliquidated, or undisputed and liquidated, may be discharged by an accord and satisfaction. *Harding v. Will,* 81 Wn.2d 132, 138, 500 P.2d 91 (1972). The parties agree, moreover, that in the factual context of this case the following statement of law applies:

> (9) Where the amount of a debt or obligation is unliquidated or in dispute, then the tender by the debtor of a certain sum in full payment of the debt, followed by acceptance and retention of the amount tendered, establishes an accord and satisfaction;

*Graham v. New York Life Ins. Co.,* 182 Wash. 612, 621, 47 P.2d 1029 (1935). *Accord, Kibler v. Frank L. Garrett & Sons, Inc.,* 73 Wn.2d 523, 439 P.2d 416 (1968).

For purposes of accord and satisfaction, the underlying dispute over the debt must be in good faith, *i.e.,* the parties must have a bona fide belief in the validity of their positions with respect to the claim. *Harding v. Will, supra; Opitz v. Hayden,* 17 Wn.2d 347, 369–71, 135 P.2d 819 (1943). *See also* 1 C.J.S. *Accord and Satisfaction* § 32, at 515–16 (1936).

The Department's first challenge is to the trial court's reliance on RCW 62A.2–306(1), which we have quoted previously in footnote 1. The trial court ruled that the quantity of fish and eggs acquired by J–Z Sales was, as a matter of law, "unreasonably disproportionate" under that statute, and that, even though J–Z Sales continued to accept the

products, a "dispute" arose as to the fair price for the excess products.

The Department argues that the court had an obligation to assess the commercial background and intent of the parties and the industry practice as a whole before it could declare that the actual output of fish in this case was unreasonable to J–Z Sales, and that the record was completely devoid of any evidence on this point. Furthermore, the Department argues that as J–Z Sales did not rely on RCW 62A.2–306(1) to reject the tender of excess fish products, but took them anyway, it has effectively waived the argument that the excess products were unreasonably disproportionate.

We think that there was a dispute for purposes of accord and satisfaction, for the following reasons. We agree with the trial court that the Department's prebid estimate of the fish products to be supplied under the contract is the source of the dispute. The estimates of quantities were designed to allow "bidding on a per pound basis and are not to be regarded as being the actual pounds of fish to be taken under the contract." So, admittedly, J–Z Sales was alerted to the possibility of an output in excess of the estimates. Equally obvious is the fact that J–Z Sales relied on the estimates for purposes of bidding. It is true J–Z Sales did not reject the excess fish products, as RCW 62A.2–306 might have allowed it to do. That does not, however, preclude a finding that the surplus of goods created a genuine dispute which could be resolved by an accord and satisfaction.

The Department has argued most persuasively that the record presents an issue of material fact whether J–Z Sales, as represented by an affidavit of its office employee Sunny Decker, had a good–faith belief that the Department would in fact afford a price reduction for the excess output of fish products. An affidavit and a letter by Assistant Director of Fisheries Robert S. Robison, as well as the two letters exchanged in late 1974 by Mr. Dahl and Director Tollefson, do create a factual issue as to the bona fides of J–Z Sales'

belief in this regard. But this argument focuses the issue too narrowly. The real questions, in our opinion, are whether there was a genuine dispute between the parties as to what price *should* be paid for the excess fish, or whether their debt was unliquidated.

A debt can be both disputed and liquidated, so the terms "unliquidated" and "in dispute" are not synonymous. In this case, however, we believe the debt was both in dispute and unliquidated.

The dispute was created by the great extent by which the Department's prebid estimates fell below the actual output of fish J–Z Sales was required to take. We need not apply RCW 62A.2–306(1) to decide this case, but it is interesting to note the wording of official comment 3 thereto:

> If an estimate of output or requirements is included in the agreement, no quantity unreasonably disproportionate to it may be tendered or demanded. Any minimum or maximum set by the agreement shows a clear limit on the intended elasticity. In similar fashion, the agreed estimate is to be regarded as a center around which the parties intend the variation to occur.

It has been held as a matter of law that a demand for goods in excess of 20 percent over the offeree's estimate is "unreasonably disproportionate" and a breach of contract, *Shea–Kaiser–Lockheed–Healy v. Department of Water & Power*, 73 Cal. App. 3d 679, 140 Cal. Rptr. 884 (1977), and so is a demand of more than double the estimate. *Orange & Rockland Utils., Inc. v. Amerada Hess Corp.*, 59 App. Div. 2d 110, 397 N.Y.S.2d 814 (1977). Similarly, we are convinced in this case that the output of more than three times the estimated amount of salmon eggs, and of nearly two–thirds more than the estimate for salmon carcasses, in the falling market conditions then prevalent, created for J–Z Sales a genuine concern about the price it was being asked to pay and a genuine dispute over whether it should have to pay the bid prices premised on the much smaller estimates. To be sure, J–Z Sales could not have decided unilaterally to modify the contract to allow payment of lower

prices for the excess output. But it could and did genuinely dispute whether it should have to pay the contract price and it did tender the lesser sum in hopes of settling the obligation.

■ Moreover, we believe the debt was unliquidated. In *First Nat'l Bank v. White–Dulaney Co.*, 123 Wash. 220, 212 P. 262 (1923), the court discussed the effect of an offset claimed by the debtor against the contract amount. In that case, the amount claimed by the creditor was definite and fixed, but the debtor claimed an offset, which rendered the debt unliquidated for purposes of accord and satisfaction. The Supreme Court employed the following language, at page 224:

> "By the weight of authority, where the debtor has an offset or claim for damages against the creditor which the latter does not concede, his claim against the debtor, although not disputed, except in respect of the offset or damages claimed, will nevertheless be considered unliquidated, the view being taken that there is no material difference between a dispute directly involving the claim itself and a dispute involving an offset against the claim; that whatever may be the ground of the dispute the fact remains that there is one." [Quoting 1 C. J. 556 (1914).]
>
> . . .
>
> "A demand, however, is not liquidated, or undisputed, even if it appears that something is due, unless it appears how much is due; and when it is admitted that one of two different sums is due, but there is a genuine dispute as to which is the proper amount, the demand is unliquidated within the meaning of that term as applied to accord and satisfaction. A dispute as to the right to a set–off or counterclaim against an otherwise undisputed claim has properly been held to render the claim as a whole a disputed claim, as the claim should be treated as a single claim consisting of the undisputed part and the set–off or counterclaim." [Quoting 1 R.C.L. 198 (1914).]

The analogy to the facts of this case is strong. Here, the amount claimed by the Department is definite and fixed, but the debtor, J–Z Sales, contends it is entitled to a price reduction due to the excessive quantities of fish and eggs

tendered and the poor market conditions. There is a genuine dispute as to which of the two sums (the contractual sum or the amount tendered) is due, and the demand is unliquidated according to the above discussion. *Accord, Evans v. Columbia Int'l Corp.*, 3 Wn. App. 955, 478 P.2d 785 (1970); *St. Regis Paper Co. v. Tonawanda Bd. & Paper Co.*, 107 App. Div. 90, 94 N.Y.S. 946, 948 (1905), *aff'd*, 186 N.Y. 563, 79 N.E. 1115 (1906).

■ The next question is whether the Department ever accepted the check tendered in full payment of the debt, so that it will be deemed to have entered into an accord and satisfaction. We hold that the Department's endorsement and deposit of the check with the county clerk was acceptance of it, despite the Department's earlier attempt to return it. True, the Department did not get the benefit or use of the funds; but the real test in such a case is whether the creditor has removed the funds from the control of the debtor. *See International Fireproof Door Co. v. Acme Builders, Inc.*, 69 Misc. 2d 299, 329 N.Y.S.2d 652 (1972); *St. Regis Paper Co. v. Tonawanda Bd. & Paper Co., supra; Curran v. Bray Wood Heel Co.*, 116 Vt. 21, 68 A.2d 712, 13 A.L.R.2d 728 (1949). The check was endorsed to the clerk, cashed, and the proceeds were held beyond the reach of J–Z Sales absent a court order. As far as J–Z Sales was concerned, the situation was no different than if the Department had deposited the funds in its own bank account. The Department was trying to lodge the funds with a neutral third party, but it did so without advance notice to J–Z Sales, which might have preferred to take the check back had it known the funds were about to be deposited with a third party. In the circumstances, we subscribe to Professor Corbin's view:

> There is no accord, either executory or executed, unless there is an offer either by the debtor to give or by the creditor to receive a substituted performance in full settlement, and an acceptance by the other party of the offer so made. Usually the offer is made by the debtor, and the problem of acceptance involves the action of the

creditor. *Where the amount due is in dispute, and the debtor sends cash or check for less than the amount claimed, clearly expressing his intention that it is sent as a settlement in full, and not on account or in part payment, the retention and use of the money or the cashing of the check is almost always held to be an acceptance of the offer operating as full satisfaction, even though the creditor may assert or send word to the debtor that the sum is received only in part payment.* The fact that the creditor scratches out the words "in full payment," or other similar words indicating that the payment is tendered in full satisfaction, does not prevent his retention of the money from operating as an assent to the discharge. The creditor's action in such case is quite inconsistent with his words. It may, indeed, be clear that he does not in fact assent to the offer made by the debtor, so that there is no actual "meeting of the minds." But this is merely another illustration of the fact that the making of a contract frequently does not require such an actual meeting.

(Footnotes omitted. Italics ours.) 6 A. Corbin, *Corbin on Contracts* § 1279, at 126–30 (1962).

Finally, the Department has raised for the first time on appeal the applicability of RCW 62A.1–207:

A party who with explicit reservation of rights performs or promises performance or assents to performance in a manner demanded or offered by the other party does not thereby prejudice the rights reserved. Such words as "without prejudice", "under protest" or the like are sufficient.

The Department argues that its actions in this case are tantamount to a reservation of rights while negotiating the check, and negate the creation of an accord and satisfaction. This argument would allow the Department to accept a check as partial payment only, even when it is tendered on the express condition that it constitutes full payment. Thus applied, the statute would contravene the common law of accord and satisfaction.

▮ Elsewhere in the Uniform Commercial Code, RCW 62A.1–103 and official comment 1 thereto require that the

principles of law and equity are not to be displaced by particular provisions of the Code unless done so explicitly by the Code. RCW 62A.1–207 applies to performance of an agreement or assent to performance in a manner offered by the other party, while explicitly reserving rights. It is completely inconsonant with accord and satisfaction, which contemplates that one party's assent to performance by the second party in a manner other than that spelled out in the contract will create a new contract, rather than permitting the first to accept part performance and still invoke remedies to enforce the original contract. The statute does not explicitly supersede the law pertaining to accord and satisfaction, and it should not be inferred as doing so. *Gallagher Lumber Co. v. Shapiro*, 137 Vt. 139, 400 A.2d 984 (1979).

We agree with the trial court that the parties had a genuine dispute over the amount to be paid in this case, that the debt was unliquidated, and that the Department of Fisheries by its conduct should be deemed to have assented to an accord and satisfaction of the debt, despite its subsequent protests to the contrary. The summary judgment is affirmed.

REED, C.J., and PETRIE, J., concur.