**MILGRAM FOOD STORES, INC., Plaintiff,**

v.

**GELCO CORPORATION, Defendant.**

**No. 81-0289-CV-W-8.**

United States District Court, W.D. Missouri, W.D.

Oct. 7, 1982.

---

Alvin D. Shapiro, Kansas City, Mo., for plaintiff.

James Borthwick and James D. Conkright, Blackwell, Sanders, Matheny, Weary & Lombardi, Kansas City, Mo., for defendant.

## MEMORANDUM AND ORDER

STEVENS, District Judge.

Plaintiff Milgram Food Stores, Inc., a Missouri corporation, brought this action to recover $48,363.10 paid by mistake to the Feld Truck Leasing Division of defendant Gelco Corporation, a Minnesota corporation, on or about December 2, 1980. (For clarity and simplicity, defendant will hereinafter be referred to as Feld rather than Gelco.) Feld counterclaimed for a setoff of $43,-169.77, based on another alleged indebtedness. Its tender of the remaining $5,193.33 was refused by Milgram.

The parties have filed an extensive stipulation with supporting exhibits, and each has moved for summary judgment in its favor. It is agreed that Milgram is entitled to return of the $48,363.10 paid by mistake unless Feld prevails on its counterclaim; moreover, as briefing on the cross motions progressed, the parties recognized that the presence of material disputed facts precludes summary judgment in favor of Feld on its counterclaim. Thus, the only question before the court is whether summary judgment should be entered in favor of plaintiff on the counterclaim. The court has concluded that it should, based upon the stipulated facts hereinafter summarized.

Pursuant to a master vehicle leasing agreement signed March 14, 1974, Feld at various times from 1974 to 1978 leased a total of sixteen vehicles to Milgram. On September 8, 1979, Feld notified Milgram that a rate increase was necessary to continue the leasing arrangement. Milgram rejected the proposal, and later that month, Feld notified Milgram it would exercise its right to terminate all leases under paragraph sixteen of the master lease. During the next several months, Feld gave the required notice and terminated the specific leases on their anniversary dates. Feld also exercised its option to require Milgram to purchase the vehicles.

Under paragraph sixteen of the master lease, upon termination Milgram was required to pay Feld "a sum equal to the prorated cost to Feld ... of unexpired license tags, personal property tax, Federal Highway Use tax, and any other or similar taxes, fees, insurance and *prepaid expenses* and *other expenses* for the vehicles with respect to which such termination is effective and any *asset loss* caused by such termination ...." (emphasis added) Pursuant to this provision, Feld prepared and submitted to Milgram "buy-out" figures on all sixteen vehicles. Among the components of the calculations were charges for interest, get-ready costs, lettering and painting, and investment tax credit. Milgram rejected these components, stating that such costs had previously been incorporated into the "capitalized agreed value" of each vehicle, and hence it would not pay such costs twice.

By letter dated November 20, 1979, Feld "propose[d] to transfer title to each of the vehicles for a purchase price calculated as provided in the computations ... less the amounts shown for interest, get ready cost, lettering/painting and investment tax credit." "If you accept this proposal, we agree to waive the amount shown for each vehicle for get ready cost, painting/lettering and investment tax credit." Feld stated that any such payment would be accepted "under protest due to business necessity with-

out the intention or effect of waiving our rights under the lease . . . ." "Feld reserves the right to institute suit against Milgram's to recover the amount of $43,169.77 for interest for all of the vehicles." (This is the amount Feld now seeks on its counterclaim.) At the bottom of the letter, Feld provided a space for Milgram to sign under the legend "Understood and agreed to." Milgram never signed the letter. Sometime later, Feld sent Milgram invoices for each of the four disputed items on several of the vehicles; Milgram still refused to pay.

Paragraph sixteen of the master lease provides: "Feld shall retain title to all vehicles purchased by Lessee pursuant to this paragraph to secure full payment of the purchase price thereof for all vehicles so purchased." Feld's "Contract Buy-Out Computation" form for each vehicle states: "Titles will not be given to customer until payment is made to Feld in an acceptable manner for agreed amount of above computation plus outstanding accounts receivables." Feld gave Milgram title to all sixteen vehicles as it received the corresponding checks from Milgram, none of which included payment for the disputed interest item.

On January 15, 1980, Milgram gave Feld a check for $161,453.60, as payment for eleven of the sixteen vehicles. Typewritten on the face of the check was this statement: "IN FULL PAYMENT FOR TITLE TO AND IN FULL SETTLEMENT OF ALL CLAIMS UNDER LEASE TO MILGRAM FOOD STORES, INC., OF TRACTORS NUMBER C–1215 THROUGH C–1225." (The other checks given by Milgram to purchase the other five vehicles bore no such legend.) Upon receipt of the check, Feld employee Stan Casper gave Milgram title to the eleven vehicles. Casper left the Milgram office only to return a short time later. In the interim he had crossed out that portion of the legend stating "AND IN FULL SETTLEMENT OF ALL CLAIMS UNDER LEASE TO MILGRAM FOOD STORES, INC." He gave Milgram a memorandum indicating what he had done. Still visible on the face of the check were the words "IN FULL PAYMENT FOR TITLE TO [words obliterated] TRACTORS NUMBER C–1215 THROUGH C–1225."

On the same day, Milgram responded with a letter to Casper:

You accepted the Milgram Food Stores, Inc. check No. 774540 in exchange for the vehicle titles without any reservations. We have never agreed to anything other than as was set forth to you and any changes you may have made on that check were not authorized on behalf of Milgram Food Stores, Inc.

The disputed interest item upon which the counterclaim is based was explained by Feld District Manager Stan Casper in a letter to Milgram dated October 30, 1979:

Interest. In the calculations of any lease rate the interest has been determined for the entire length of the contract and then averaged over the contract period so that a fixed interest cost can be recovered each year. In the first year we paid more interest than we received as we do in the subsequent years until we reach the midway point at which the interest costs are reversed. Since each of these units are terminated before the end of the contract period we have calculated the interest expended, given you credit for the interest recovered for the years the contract was in force and the difference is the interest which we have prepaid and we consider a prepaid expense.

Milgram advances several alternative arguments to support entry of summary judgment in its favor on the counterclaim. First, Milgram contends Feld has no right to recover the disputed interest charges under the terms of paragraph sixteen of the master lease. Second, Milgram asserts that Feld has waived any right it may have to the disputed sums by transferring title to the vehicles and accordingly is estopped from pursuing its claim. Finally, Milgram contends that Feld's acceptance of the "full payment" check constitutes an accord and satisfaction as to eleven of the sixteen vehicles. The court has concluded that all three of Milgram's arguments are meritorious.

### I.

■ The contract language does not encompass the disputed interest item. Under paragraph sixteen of the master lease, the lessee upon termination shall pay Feld the prorated cost of "unexpired license tags, personal property tax, Federal Highway Use Tax, and *any other or similar* taxes, fees, insurance and *prepaid expenses . . . .*" (emphasis added) This language appears to encompass reimbursement for expenditures Feld has made at the direction of a third party who requires payment in advance. For instance, an annual license fee is paid at the beginning of the year rather than upon the expiration of the license. On the other hand, Feld paid interest on the vehicles as it accrued. The lenders did not require the prepayment of interest by Feld. "[P]repaid interest is an agreed consideration for the extension of credit, or for the use, forebearance or detention of money, which consideration is due before it actually accrues." *Goldman v. First Federal Savings & Loan Association,* 377 F.Supp. 883, 886 (N.D.Ill.1974), *rev'd on other grounds,* 518 F.2d 1247 (7th Cir.1975). It is also stipulated that "Feld paid no interest penalties to any of the financing agencies" because of the lease termination. The sole explanation for the alleged underpayment of interest by Milgram is the method by which Feld calculated the lease payments and not the actions or requirements of some third party. The compensation Feld seeks is therefore not within the terms of the contract.

As for the other two phrases Feld relies upon—"other expenses" and "asset loss"—the court finds these entirely too vague and ambiguous to encompass the interest sought to be recovered. It is well settled that "an ambiguous contract should be construed strongly against the drafting party." *Walker v. Woolbright Motors, Inc.,* 620 S.W.2d 451, 453 (Mo.App.1981). Feld drafted the four pages of fine print which constitute the master lease. Feld elected to terminate the agreement, and if it now proves inadequate to protect the interests of the draftsman, Feld must bear sole responsibility for its predicament.

### II.

■ Assuming *arguendo* that the master lease would permit Feld to recover the disputed interest item, the court finds, as an alternative rationale for the result reached here, that Feld waived such right and is estopped from asserting it. "Waiver generally is the intentional relinquishment of a known right. . . . It may be either express or implied." *United Missouri Bank South v. Cole,* 597 S.W.2d 209, 211 (Mo.App.1980) (citation omitted). *See generally* 28 Am. Jur.2d *Estoppel and Waiver* § 154 (1966). "If intent is implied by conduct, as would be necessary here, there must be a clear, unequivocal and decisive act implying the intent and the implication must be so consistent with an intention to waive that no other reasonable explanation is possible." *Grebing v. First National Bank,* 613 S.W.2d 872, 876 (Mo.App.1981). The court finds the stipulated evidence clearly establishes waiver by Feld of any contractual right it may have had to recover the amount claimed here.

Paragraph sixteen of the master lease states in part: "Feld *shall* retain title to all vehicles purchased by Lessee pursuant to this paragraph to secure full payment of the purchase price thereof for all vehicles so purchased." (emphasis added) The Contract Buy-Out Computation form prepared by Feld similarly states: "Titles will not be given to customer until payment is made to Feld in an acceptable manner for agreed amount of above computation plus outstanding accounts receivables." Despite its announced intention, Feld transferred title to all sixteen vehicles even though payments by Milgram did not include the disputed interest item. Feld explains that it elected not to utilize the protection afforded by the contractual provisions; instead, it decided to rely upon its reservation of rights, an apparent reference to the letter of November 20, 1979.

Feld's position cannot withstand even casual scrutiny. The letter of November 20, 1979, was nothing more than a proposal

by Feld which Milgram never accepted. Feld offered to transfer title if Milgram paid all undisputed sums; moreover, Feld would waive its claim to all disputed buy-out components except "prepaid" interest. Not only did Milgram reject the proposal, but Feld's subsequent conduct is inconsistent with even unilateral compliance with the terms of the letter, for it later sent invoices to Milgram for all disputed components on most of the vehicles.

Actions speak louder than words, and the facts clearly establish an implied waiver. Feld knew all too well that Milgram adamantly refused to pay the disputed sums, yet it transferred titles to the vehicles anyway. Feld characterizes the arrangement as a pragmatic attempt to resolve as much of the dispute as possible without litigation because "Feld needed its money." Disputes are settled daily for precisely this reason. The court is persuaded that this dispute was, and would have remained, settled were it not for the mistaken payment by Milgram. On the basis of the facts presented, Milgram was entitled to operate upon the reasonable assumption that Feld had relinquished its claim to the disputed interest item. To permit Feld to retain the mistaken payment would certainly be unjust; therefore, Feld is estopped from asserting its claim for "prepaid" interest, even assuming the contract would permit such a recovery. *See generally Chrysler Credit Corp. v. Friendly Ford, Inc.*, 535 S.W.2d 110, 112 (Mo.App.1976); 28 Am.Jur.2d *Estoppel and Waiver* §§ 68, 77 and 78 (1966).

### III.

■ The final alternative rationale for this decision applies only to the eleven vehicles involved in the transaction of January 15, 1980, in which Milgram tendered a check to Feld bearing "full payment and settlement" language. Feld took the check, obliterated that portion of the language referring to "full settlement," and negotiated the check. Milgram argues that the parties reached an accord and satisfaction as to these eleven vehicles. The court agrees.

An accord and satisfaction is a contract for the settlement of a disputed or unliquidated claim for an amount less than that claimed by the creditor. Such contract has been held to have been made in a myriad of cases, where a check has been tendered in payment of an account on express condition that acceptance thereof shall be deemed to be satisfaction in full. There have been repeated rulings that if the creditor cashes the check under such circumstances, an accord and satisfaction results notwithstanding protests on his part. Even his striking out or modification of the condition written on the check has been held to be ineffective.

*Henderson v. Eagle Express Co.*, 483 S.W.2d 767, 768 (Mo.App.1972). Feld contends this common law principle has been displaced by Mo.Ann.Stat. § 400.1–207 (Vernon 1965):

A party who with explicit reservation of rights performs or promises performance or assents to performance in a manner demanded or offered by the other party does not thereby prejudice the rights reserved. Such words as "without prejudice," "under protest" or the like are sufficient.

Feld argues that it explicitly reserved its rights to contest the interest item, and it offers cases from other jurisdictions generally supporting its position. *See, e.g., Scholl v. Tallman*, 247 N.W.2d 490 (S.D. 1976).

The effect of section 400.1–207 upon the doctrine of accord and satisfaction by full-payment check has never been considered in a reported decision by any Missouri court.[1] Authorities from other jurisdictions are generally split on the question. *See* T. Quinn, *Uniform Commercial Code Commen-*

---

1. For instance, the *Henderson* decision quoted above, although decided well after the effective date of section 400.1–207, simply assumed the continued validity of the common law doctrine without mentioning the new statutory provision. From this it could be argued that the Missouri courts have implicitly rejected Feld's construction of section 400.1–207. *See* Rosenthal, *Discord and Dissatisfaction: Section 1–207 of the Uniform Commercial Code,* 78 Colum.L.Rev. 48, 67–68 (1978).

*tary and Law Digest* ¶ 1–207[A][1] (Cum. Supp.1980). This court has reviewed the authorities on both sides of the matter and concludes that a Missouri court probably would hold that section 400.1–207 has not displaced the common law doctrine of accord and satisfaction by full-payment check. A number of reasons have prompted this conclusion.

First, section 400.1–207 is by its own terms inapplicable to the situation presented here. Feld did not assent "to performance in a manner . . . offered" because it rejected the essential condition upon which Milgram tendered the check—full payment and settlement of all claims concerning the eleven vehicles. *See Brown v. Coastal Truckways, Inc.,* 44 N.C.App. 454, 261 S.E.2d 266, 268 (1980).

Second, Mo.Ann.Stat. § 400.1–103 (Vernon 1965) provides that "[u]nless displaced by the particular provisions of this chapter, the principles of law and equity . . . shall supplement its provisions." The Official Comments to section 400.1–103 note that common law principles remain intact unless "explicitly displaced." On its face, section 400.1–207 states only a general principle and makes no mention of a full-payment check. *See State Department of Fisheries v. J–Z Sales Corp.,* 25 Wash.App. 671, 610 P.2d 390, 395–96 (1980). There is also authority suggesting that the drafters of the Uniform Commercial Code never intended that section 1–207 would change the law concerning full-payment checks. *Chancellor, Inc. v. Hamilton Appliance Co.,* 175 N.J.Super. 345, 418 A.2d 1326, 1329–30 (Passaic County Ct.1980); Rosenthal, *Discord and Dissatisfaction: Section 1–207 of the Uniform Commercial Code,* 78 Colum.L.Rev. 48, 58–63 (1978).

Finally, the court must reject Feld's interpretation of section 400.1–207 as commercially unwise. To permit a creditor to accept payment but reject the essential terms upon which it is offered would lessen the chances of settlement and prolong the dispute. This case amply illustrates the consequences of such a rule. *See generally id.* at 55–58. Therefore, the general rule as stated in *Henderson* and quoted above requires entry of summary judgment in Milgram's favor as to the eleven vehicles involved.[2]

## IV.

For the alternative reasons stated, it is

ORDERED that summary judgment is entered in favor of plaintiff Milgram Food Stores, Inc. and against defendant Gelco Corporation on Milgram's complaint in the amount of $48,363.10 plus interest of 9% per annum since December 2, 1980. Mo.Ann. Stat. § 408.040 (Vernon Supp.1982). It is further

ORDERED that summary judgment is entered in favor of plaintiff Milgram Food Stores, Inc. and against defendant Gelco Corporation on Gelco's counterclaim. It is further

ORDERED that costs shall be taxed to defendant.

---

**2.** Even if the court accepted Feld's construction of section 400.1–207, an accord and satisfaction would still be found on these facts because Feld only obliterated the language on the check concerning "full settlement"; it did not disturb the "full payment" language, thus indicating it accepted that provision.